**James Roy McBETH, Ervine Hawthorne, Lee Calloway, and the Arkansas Teachers Association, Inc., Plaintiffs,**

v.

**The BOARD OF EDUCATION OF the DeVALL'S BLUFF SCHOOL DISTRICT NO. 1, DeVall's Bluff, ARKANSAS, and J. O. Clark, Superintendent of Schools, Defendants.**

**No. LR–68–C–206.**

United States District Court
E. D. Arkansas, W. D.
June 20, 1969.

John W. Walker, Little Rock, Ark., for plaintiffs.

Robert V. Light, Little Rock, Ark., for defendants.

## Memorandum Opinion

HENLEY, Chief Judge.

This is a suit for reinstatement and damages brought by two displaced Negro school teachers against the Board of Directors of DeVall's Bluff School District No. 1, DeVall's Bluff, Arkansas, and J. O. Clark, the Superintendent of Schools of said District.[1] The Arkansas Teachers Association, Inc., a professional organization of Negro school teachers in Arkansas joined itself as a party plaintiff because of its interest in the impact of school integration in Arkansas on Negro educators.

The plaintiffs, James Roy McBeth and Ervine Hawthorne, lost their jobs when the secondary grades at the all Negro Biscoe School operated by the District were discontinued at the close of the 1967–68 school year. Plaintiffs claim that the failure of the District to offer them employment with respect to that year amounted to racial discrimination prohibited by the Fourteenth Amendment to the Constitution of the United States. In addition, the plaintiff McBeth, a veteran employee of the District, claims that down through the years he was subjected to discrimination in pay, and he seeks relief in that connection with respect to the three years prior to the commencement of the suit on October 9, 1968.

The defendants have answered the complaint and have denied that plaintiffs are entitled to any relief, legal or equitable.

Federal jurisdiction is established, 28 U.S.C.A. § 1343(3) and 42 U.S.C.A. § 1983. The case has been tried to the Court and submitted on the pleadings, discovery material, depositions, oral testimony, documentary evidence, and memorandum briefs. This memorandum incorporates the Court's findings of fact and conclusions of law.

DeVall's Bluff is a small Eastern Arkansas city located on the south bank of White River on United States Highway 70. It is the county seat of Prairie County. The defendant school district includes the City of DeVall's Bluff and additional rural territory. The small town of Biscoe located four miles east of DeVall's Bluff is included within the boundaries of the District.

Prior to and after the decisions of the Supreme Court of the United States in *Brown* the public schools of the District were completely segregated both with respect to student bodies and faculties. Each school system consisted of twelve grades. The white schools were located in DeVall's Bluff and will be called the DeVall's Bluff schools. The Negro school was located at Biscoe and in District records is referred to as the "Biscoe Center."

The affairs of the District are administered by an elected board of directors consisting of eight individuals. The defendant, J. O. Clark, is the Superintendent of Schools, and he has held that position for some nine years. The staff of the DeVall's Bluff schools consists of a high school principal, an elementary grade principal, a number of classroom teachers, and supporting personnel.

Before this controversy had its genesis, the staff of the Biscoe Center consisted of a principal, classroom teachers, a custodian, and a bus driver. Plaintiff, McBeth, was the principal and had served in that capacity for 18 years.

---

1. This suit was filed originally by three former teachers of the District. However, at the commencement of the trial the claim of one of the plaintiffs, Lee Calloway, was dropped, and the complaint as to him was dismissed.

During the 1967–68 school year the Biscoe Center had ten classroom teachers, including the wife of the plaintiff McBeth, and also including the plaintiff Hawthorne who was a classroom teacher of home economics. The session just mentioned was the first at which Mrs. Hawthorne had been employed by the District, but she had about 18 years experience teaching in Negro schools in other Arkansas school districts.

Between September 1966 and September 1968 a minimal number of the Negro students were assigned to the DeVall's Bluff schools on the basis of freedom of choice. No white students opted to attend school at Biscoe.

Until recently, Negro students residing in the Hazen and Carlisle school districts, which had no Negro schools, were taught at the Biscoe Center on a tuition basis. However, the Department of Health, Education and Welfare required the District to cease offering instruction to such students, and the District complied with the requirement.

The result was that the student body at Biscoe was substantially reduced in numbers, and the Board decided to close the Biscoe Center over a two-year period. Instruction at the secondary level was discontinued as of the close of the 1967–68 year, and instruction in the elementary grades was discontinued as of the close of school in May 1969. Thus, the District's student bodies have now been completely integrated.

The phasing out of the secondary grades at Biscoe had an immediate and adverse impact on Principal McBeth and Mrs. Hawthorne. Both were notified that they would not be reemployed for the 1968–69 session, and neither was reemployed.[2] The letter written to McBeth was curt and formal; it specified no reason for his termination. The letter to Mrs. Hawthorne was quite cordial.

The undisputed evidence is to the effect that the Board and the Superintendent never considered transferring McBeth to the DeVall's Bluff schools in any capacity, administrative or instructional, notwithstanding his long service in the District and notwithstanding the fact that he holds a Master's degree and is certified by the State of Arkansas not only as a principal but also as a high school teacher in the field of social science.

It seems that the Superintendent at least purported to compare the qualifications of Mrs. Hawthorne with those of Miss Barbara Smith, a white teacher of home economics in the DeVall's Bluff schools. The Superintendent decided to retain Miss Smith and to terminate Mrs. Hawthorne. The Court will return to that comparison in due course.

Another Negro teacher, Rufus Alexander, was transferred to the white schools as an instructor in industrial arts (shop). Industrial arts and vocational agriculture are both offered in the DeVall's Bluff schools as elective subjects. During the 1968–69 session only Negro students chose to study industrial arts and only white students chose to study vocational agriculture, which is taught by a white man.

During the same session Ernestine Holloway who had taught in the elementary grades at Biscoe was assigned to the DeVall's Bluff schools as an elementary school librarian. She had no instructional duties.

It should be mentioned that during the 1967–68 session the DeVall's Bluff schools had no high school principal. It appears that Superintendent Clark served both as Superintendent and as high school principal during that term. However, it was decided at a time not disclosed by the record that the DeVall's Bluff schools would have a principal for the 1968–69 session, and Mr. Raymond

2. Mr. McBeth was advised that he had the "privilege" of appearing before the Board to ask for reconsideration. He did not do so. The Court does not consider that to be material since the "privilege" extended to McBeth did not amount to an "administrative remedy" which he was required to exhaust.

Inman, who had worked for the District as a vocational agriculture teacher and bus driver for about eight years, was hired for the job. As indicated, that position was not offered to McBeth, and he was not even considered for it.

As has been seen, the Biscoe Center has now been closed. One of the elementary teachers who taught at Biscoe for 40 years is retiring; the remaining elementary teachers, including Mrs. McBeth, are to be retained in the former white school system.

## I.

■ It is settled in this Circuit, as elsewhere, that those in charge of public school systems may not constitutionally discriminate against Negro school administrators and teachers on the basis of their race. When student body integration permits a school district to reduce its force of administrators and teachers, the reduction is not to be entirely at the expense of Negro employees. The problem must be solved in a racially nondiscriminatory manner. Walton v. Nashville, Arkansas Special School District No. 1, 8 Cir., 401 F.2d 137; Smith v. Board of Education of Morrilton School District No. 32, 8 Cir., 365 F.2d 770; Brooks v. School District of City of Moberly, 8 Cir., 267 F.2d 733.

■ On the other hand, Arkansas principals and classroom teachers have but limited tenure rights under Arkansas law, and local school districts are not required to hire, retain, promote, or compensate on the basis of seniority. See Ark.Stats.Ann. § 80–1304(b); Johnson v. Wert, 225 Ark. 91, 279 S.W.2d 274. And while a Negro employee of a school district has a federal constitutional immunity from discrimination on account of race, he does not have a vested right to remain in the employ of the school district. Shelton v. Tucker, 364

U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231; Freeman v. Gould Special School District, 8 Cir., 405 F.2d 1153; Walton v. Nashville, Arkansas Special School District, No. 1, supra; cf. Norton v. Blaylock, W.D.Ark., 285 F.Supp. 659, aff'd 8 Cir., 409 F.2d 772.

In a case of this kind a Court has a two-fold problem. It must determine, first, whether there has been racial discrimination against Negro school employees as a class or as against individual Negro employees. Second, if discrimination is found, the Court must grant appropriate relief, whether legal or equitable, or both.

School desegregation in one district does not necessarily present the same employment problems in one district as it does in another district, and each case must be decided in the light of its own facts and circumstances. Walton v. Nashville, Arkansas Special School District No. 1, supra, 401 F.2d at 143. The Court thinks that such a case by case approach must be taken not only in determining whether there has been discrimination but also in devising an appropriate remedy if discrimination is found to exist.

With those general principles in mind, the Court will now take up the individual cases of the plaintiffs, and will consider that of Mrs. Hawthorne first.[3]

## II.

The evidence reflects that Mrs. Hawthorne holds a Bachelor of Science degree in home economics (BSHE) from Arkansas A.M.&N. College, a predominantly Negro institution, and has done some post graduate work. When she was employed by the District she had years of experience teaching in other districts. She had a valid certificate to teach vocational home economics and general science at the high school level. There

---

3. It might be noted that this case differs from the Morrilton case, supra, in that here the officials of the District have not discriminated against all of the Negro teachers as a class as the Court of Appeals held was done at Morrilton. In that case when an all Negro school was closed, all of the Negro staff and faculty of that school were terminated; no effort was made to incorporate any of them into the formerly all white school system.

is no suggestion whatever that she is not a competent teacher, and, indeed, the Superintendent stated in his letter of dismissal that he would be glad to recommend her to the officials of any district where she might seek employment.

Miss Smith has a BSE degree from State College of Arkansas, a predominantly white institution. She also is certified to teach high school home economics; she is not certified to teach general science. Miss Smith was hired in the summer of 1967 about a month before Mrs. Hawthorne was hired, and her job with the District was her first teaching position; she had no prior experience. As in the case of Mrs. Hawthorne, there is no suggestion that Miss Smith is not a competent teacher, although she lacks the experience of Mrs. Hawthorne.

The Superintendent testified that he compared the qualifications of Mrs. Hawthorne with those of Miss Smith, and that he decided to retain Miss Smith and terminate Mrs. Hawthorne for two reasons; first, he had hired Miss Smith a month before he hired Mrs. Hawthorne; second, he considers that State College of Arkansas is a "better" college than A.M.&N.

The Court considers the first reason to be frivolous, and the second to be invalid. Regardless of the superiority, real or supposed, of State College of Arkansas over A.M.&N., the superiority would hardly outweigh in any rational and objective mind the long experience of Mrs. Hawthorne in teaching her specialty.

The Court is convinced and finds from a preponderance of the evidence that had Mrs. Hawthorne been a white woman and had she been teaching side by side with Miss Smith in the DeVall's Bluff schools, and had it become necessary for the District to let one of them go, Mrs. Hawthorne would have been retained and Miss Smith would have been released. The Court finds further that Mrs. Hawthorne was terminated because the District was not prepared at the time to assign another Negro high school teacher to the formerly all white schools and because the Board and Superintendent were not willing to replace a white teacher who had given satisfactory service with a Negro teacher who had given satisfactory service.

Hence, with respect to the first question presented in Mrs. Hawthorne's case, the Court finds and concludes that her termination was racially discriminatory and unconstitutional.

Mrs. Hawthorne seeks both reinstatement and damages. Her claim for damages is not sustained by the evidence. It is undisputed that she found work for the 1968–69 term at Bearden, Arkansas, and that she was paid more money at Bearden than she had been receiving at Biscoe. There is no evidence that would justify a finding that had she been employed in the DeVall's Bluff schools she would have received more money than she was in fact paid at Bearden. She did incur some expenses in finding the job at Bearden and in moving there to teach, but the Court is not able to say from the evidence how much those expenses were.

Mrs. Hawthorne's claim for reinstatement presents in clear focus the question of whether a Negro teacher threatened with termination in connection with school integration is entitled to have her qualifications, paper and other, evaluated objectively and without regard to race, in comparison with other teachers teaching in a field or in fields in which he or she is qualified to teach, and to replace another teacher if better qualified.

The Court of Appeals for the Fourth, Fifth, and Sixth Circuits have so held. Wall v. Stanly County Board of Education, 4 Cir., 378 F.2d 275; United States v. Jefferson County Board of Education, 5 Cir., 372 F.2d 836; [4] Rolfe v. County Board of Education of Lincoln County, 6

---

4. Particular attention is called to Section VIII(b) of the Model Decree promulgated by the Court, 372 F.2d at 900.

Cir., 391 F.2d 77. And there is no reason to believe that the Court of Appeals for this Circuit will not follow suit if it has not in effect done so already.[5]

In Walton v. Nashville, Arkansas Special School District No. 1, supra, a case which closely resembles this one, a home economics teacher in a Negro school about to be closed as a result of a consolidation with a formerly all white school lost her job. Her qualifications had been compared with those of two other teachers, and in each instance the white teacher had been found better qualified. District Judge Harris held that her termination was justified, and the Court of Appeals in affirming said that the administrative decision, approved by the District Court, had adequate evidentiary support, and that the District Court's finding that the Negro teacher's termination was on grounds other than racial was not "clearly erroneous." (401 F.2d at 144.)

In the instant case this Court has found that the administrative decision in the case of Mrs. Hawthorne amounted to racial discrimination. Obviously, the *Nashville* case is applicable here in converse.

Since Mrs. Hawthorne has already been evaluated, no useful purpose is to be served by having her evaluated again. The Court is satisfied that the District should be ordered to offer her employment in DeVall's Bluff High School either as a home economics teacher or as a general science teacher for the 1969–70 school year at a salary comparable to those paid to other teachers in that school.[6] The offer is to be made within the next two weeks, and is to be accepted or rejected in writing by Mrs. Hawthorne within two weeks thereafter. The Court hopes that the reemployment of Mrs. Hawthorne will not cause Miss Smith or any other teacher to lose her or his situation, but in this context the constitutional rights of Mrs. Hawthorne are paramount.

### III.

Turning now to the case of McBeth, the Court finds it convenient to pass first upon his claim that during the years of his employment he was by reason of race paid substantially less than white employees having similar credentials and experience.

Nearly twenty-five years ago it was held in Morris v. Williams, 8 Cir., 149 F.2d 703, that an Arkansas school board cannot constitutionally pay Negroes, as Negroes, lower salaries than those paid to whites, as whites. While many school districts in Arkansas have fixed and objective salary schedules fixing salaries on the basis of education and teaching experience, the Court does not consider that the Constitution requires such schedules, and the defendant District does not have a salary schedule, although no teacher, white or black, is requested to work for less than a minimum sum of money which appears to be the same for both white and Negro teachers. Starting at the minimum the actual compensation paid to a given teacher is based upon negotiations between that teacher and the Superintendent.

The evidence discloses that during 1967–68 Principal McBeth was paid $5,796; there was no white high school principal during that session; the elementary principal at DeVall's Bluff was paid $5,800. The salary of the high school principal during the 1968–69 session was $8,400. During the 1966–67 session McBeth was paid $4,404, and his white counterpart was paid $4,608. During the year 1965–66 McBeth was paid $4,800, and the secondary grade principal at DeVall's Bluff was paid $4,404.

5. The *Morrilton* case was decided in 1966. The *Nashville* case was decided about two years later in 1968. Judge Blackmun wrote the opinion of the Court in both cases. In the interim between the two decisions the Court passed upon a number of school cases involving the more common problem of faculty desegregation, which cases are listed at pages 144–145 of 401 F.2d.

6. The Court will have more to say about salaries in the District when it discusses the claim of Principal McBeth.

The evidence also reveals that in general Negro teachers are paid substantially less than white teachers. For example in 1967–68 Mrs. Hawthorne with her long previous experience was paid $300 a year less than Miss Smith with no previous experience.

It must be recognized that the absence of formal salary schedules revealing the existence of discrimination against Negroes salarywise does not prove that there is an absence of discrimination. And it is evident that salaries based on individual Superintendent-teacher negotiations can be discriminatory. For example, a Superintendent in negotiating salaries within the framework of a limited budget may deliberately set out to hire Negroes for less so that he can pay more to white teachers, or he may assume a harder bargaining position with Negroes than with whites.

■ However, the Court does not find from a preponderance of the evidence that the salary differentials that have been described were the result of racial discrimination. There is no satisfactory evidence from which the Court can find that Mr. Clark did not bargain in good faith with Negro teachers and job applicants, or that he tried to take advantage of them on account of their race, or that he discriminated against them racially as far as their salaries were concerned. He testified in effect that he hired all teachers for as little as he could above the minimum, and that in general he could get Negro teachers for less money than he was required to pay white teachers. The Court accepts his testimony on that point, and McBeth's claim for damages on account of discrimination in salary will be rejected.

Passing on to McBeth's claim that his termination was discriminatory the defendants alleged in their answer and undertook to prove at the trial that in spite of his training and experience McBeth was not a satisfactory employee and would have been terminated at the end of the 1967–68 school year even if the Biscoe Center had been left undisturbed.

Before getting into that controversy, the Court will say that there is no question that McBeth has the paper qualifications to be a high school principal in any school district in Arkansas. And at least on paper his qualifications are better than those of Mr. Inman who was employed as principal at DeVall's Bluff High School for the 1968–69 school year. It is evident that before Inman was hired, the Board knew that McBeth would be out of a job as of the close of the 1967–68 session, but, as has been said, no consideration whatever was given McBeth for the DeVall's Bluff principalship.

The evidence relied on by the Board is to the effect that McBeth was a poor administrator, that he let the Biscoe students roam around at large during school hours, that he let his school plant become dirty and unsanitary, that he permitted improper use of the Biscoe school bus, that he neglected the adult education class that he was supposed to teach at night, that he paid too little attention to the classes being conducted at Biscoe, and that on one occasion he violated the election laws.

Superintendent Clark and Board member, W. K. Dodson, testified, the latter by deposition, that a majority of the Board had wanted to dispense with McBeth's services for a number of years, but that McBeth had the support of the long-time president of the Board who lost his seat in the September 1967 school election, and that during his tenure a majority of the Board were not willing to overrule their president.

The Court is not concerned here with McBeth's abilities or deficiencies as a school administrator or otherwise, except to the extent that they may shed light on the question of whether his termination amounted to racial discrimination.

It appears to the Court from the evidence that McBeth perhaps left much to be desired as a principal and that regardless of race he would never have been considered seriously for employment as principal of DeVall's Bluff High School.

On the other hand, it appears to the Court that McBeth did not have much of a school to administer in the first place, and he received only scant supervision, assistance, or counselling from his superiors whose interest in the Biscoe Center seems to have been perfunctory at best.

It would be speculative to say whether McBeth would have been terminated at the end of 1967–68 had the secondary grades at Biscoe not been phased out at the end of that year. It is hard for the Court to believe that a majority of the Board would have permitted McBeth to stay on as long as he did if they had been seriously dissatisfied with his performance. And, with due regard to the testimony of Mr. Clark and Mr. Dodson, the Court nevertheless is of the opinion that the Board and the Superintendent found little real fault with McBeth as long as he was administering an all Negro school four miles away from DeVall's Bluff and on the other side of White River. In the Court's estimation, their concern about his management of the school did not arise until after they realized that keeping him in the system after the phasing out of the Biscoe Center would or might entail giving him an administrative job in the contemplated integrated school system, which would have put him in authority over white teachers and students and in contact with white parents of school children.

The decision to close the Biscoe Center was made in January 1968, and the Court does not overlook the fact that an admonitory letter about certain phases of his administration was written to McBeth in October 1967. However, there is no evidence that that letter was ever followed up, and some of the charges made at the trial were not mentioned in the letter.

Assuming without deciding that his administration was poor, it had been poor for years, and the Board knew it and was on notice of it. The Court does not think that a school board can tolerate poor administration of a Negro school by a Negro over a long period of time, and

then in the context of integration justify discharging him on the basis of deficiencies or conduct which the officials of the district were prepared to overlook as long as segregation prevailed.

▮ As in the case of Mrs. Hawthorne, the Court finds and concludes that the District was guilty of racial discrimination in terminating McBeth, and that he is entitled to relief.

▮ ..After his termination McBeth found employment in North Little Rock at Shorter College which is a predominantly Negro institution. His salary there for the 1968–69 session was $5,000 as opposed to the $5,796 salary that he had been receiving at Biscoe. There is no evidence that the District would have paid him any more money had he not been terminated, and the Court finds that on account of his termination he sustained damages to the extent of $796.

McBeth testified that he had some difficulty in getting another job, that he made trips to Marianna, Helena, Forrest City, and Hot Springs, and he, of course, came to North Little Rock. He says that his expenses amounted to about $300, but he could give no itemization. The Court is not convinced that he spent that much, and finds that no more than a nominal award should be made to him with respect to his expenses. In the circumstances the Court thinks that a "nominal award" would not be more than $50, and that sum will be allowed.

The question of what equitable relief should be made in McBeth's case is not without difficulty. He is primarily a school administrator, whether a good one or a mediocre one; and devising equitable relief for him presents a somewhat different problem from that presented in connection with a classroom teacher. A classroom teacher deals primarily with the students whom he or she teaches. An administrator, particularly a principal, must deal with students, teachers, and outside persons. He may be more or less a maker of policy. The school that McBeth administered for so long was a rural school; by the legal defini-

tion of *Brown* his school was inferior in law to the DeVall's Bluff schools, and the Court has little doubt that it was also much inferior in fact.

This Court is not unmindful of the fact that the Court of Appeals has rejected the argument that a Negro cannot teach white children successfully, and that a white teacher cannot teach Negro children successfully. Cato v. Parham, 8 Cir., 403 F.2d 12; Smith v. Board of Education of Morrilton School District No. 32, supra. However, the Court thinks that it would be unrealistic not to recognize that Mr. McBeth may have deficiencies as an administrator that would be more of a handicap to him in the DeVall's Bluff schools than they would be at the Biscoe Center.

After McBeth's termination he obtained or renewed an elementary teaching certificate. So, as the Court understands the situation, he now has an administrator's certificate, and both a high school and elementary school teacher's certificate. He has never been considered or evaluated by the Superintendent or the Board for any position in the DeVall's Bluff schools.

The Court thinks that the proper course to pursue is to grant Mr. McBeth some interlocutory relief at this time and to retain jurisdiction of the case should further proceedings be necessary.

■■■ It is inconceivable to the Court that the District cannot find some position for McBeth either in an administrative capacity or as an instructor and at a salary comparable to or in excess of that which he was receiving at Biscoe in 1967–68, and the Board will be ordered to evaluate his qualifications objectively and without regard to his race.

If within the next two weeks the Board offers him a position that is acceptable to him, and if he accepts it, that will be an end of the matter. If an offer is made to him, he is to accept it or reject it in writing within two weeks after it is made.

If the Board declines to offer him employment, it must file with the Court a full report of the reason or reasons for its action, and in view of the past discrimination against Mr. McBeth the Board must be prepared to justify further refusal to employ him by clear and cogent evidence. Wall v. Stanly County Board of Education, supra, 378 F.2d at 278.

If the Board offers employment which McBeth is not willing to accept, and if he desires to litigate the matter further, he may file an appropriate pleading herein within a reasonable time and in no event later than August 1 of the current year.

A decree in accordance with the foregoing will be entered. Costs will be taxed against the District, and the District will be required to pay counsel for plaintiffs a fee of $450 for their services up to this time.