Samuel Wayne CATO et al., Plaintiffs,

v.

Lee PARHAM et al., Defendants.

No. PB–67–C–69.

United States District Court
E. D. Arkansas,
Pine Bluff Division.
July 25, 1969.

George Howard, Jr., Pine Bluff, Ark., for plaintiffs.

Robert V. Light, Little Rock, Ark., for defendants.

## Memorandum Opinion

HENLEY, Chief Judge.

This school desegregation case, involving Dollarway Public School District No. 2, Jefferson County, Arkansas, is before the Court once again, and once again the Court finds itself unable to give full or lasting approval to the latest desegregation plan submitted by the District's Board of Directors.

The plan involves geographical attendance zones for students in the junior high school and elementary school grades; the plan also involves faculty desegregation. The case presents questions generally similar to those presented in Graves v. The Board of Education of the North Little Rock, Arkansas, Public School District, D.C., 302 F.Supp. 136, this day decided. Defendants in both cases are represented by the same attorneys, and the contentions in both cases are similar. The Court has considered the two cases at the same time, and this opinion should perhaps be read in connection with the North Little Rock opinion.

While conditions in the two Districts are generally similar, the Court thinks it well to say at the outset of this opinion that there are certain distinctions to be made between them. The Dollarway District is a small district with comparatively few students and with few schools; the North Little Rock District is a large district with many students and many schools. The Dollarway District has traditionally provided transportation for a substantial number of its students whereas the North Little Rock District has never transported any students and owns no school busses. More important, the Dollarway District has been in litigation ever since 1958 and has resisted desegregation of its student bodies and faculties every step of the way; the North Little Rock District was not drawn into litigation until the summer of 1968. Having noted

these distinctions, the Court now turns to the instant case.

On July 25, 1968, the Court found that the freedom of choice method of assigning students to the schools of the District had not and would not disestablish a dual school system of racially identifiable schools, and entered a decree commanding the District to replace freedom of choice with something else. Cato v. Parham, E.D.Ark., 293 F.Supp. 1375. The Court of Appeals affirmed. Cato v. Parham, 8 Cir., 403 F.2d 12. In the course of the argument on appeal counsel for the District assured the Court that the District was going to solve its integration problems by rationally created geographical attendance zones.

The Court of Appeals accepted that assurance at face value and also took the view that if the student bodies were effectively integrated, staff and faculty desegregation would take care of itself. Both the decree of this Court and the opinion of the Court of Appeals ordered the dual school system to be disestablished as of the opening of the 1969–70 school year.[1]

Following the decision of the Court of Appeals the District worked out five attendance zones for its elementary schools and for its combination junior senior high schools and submitted its plan, based on the zones to the Court for its approval. On March 25 of the current year the Court filed a memorandum opinion and entered a decree refusing to approve the zones. Cato v. Parham, E.D.Ark., 297 F.Supp. 403. Reference is made to that opinion for a full discussion of the Dollarway situation in relation to attendance zones.

The Court's decree read in part as follows:

"3. That the defendant District be, and it hereby is, mandatorily enjoined to proceed to disestablish, effective with the opening of school in September 1969, the existing dual school sys-

---

1. That year is upon us, and for convenience it will be referred to at times as

"this year." The 1970–71 term will be called at times "next year."

tem being operated by the District and to replace it with a unitary system free from racial discrimination, and in that connection is further mandatorily enjoined and commanded to restructure its schools in a manner not inconsistent with the aforesaid Memorandum Opinion of this Court.

"4. That not later than May 1 of the current year the defendant District file with the Court a written report reflecting the method of restructuring of its schools which it plans to put into effect and reflecting what the District proposes to do in the area of staff and faculty integration."

On April 29, 1969, the Board filed its report, in the form of a resolution, which report was based on studies made by a committee of the Board, the Superintendent of Schools, his staff, and counsel for the Board. A copy of the report last mentioned was attached to the resolution of the Board so that both reports are of record here.

In substance, what the Board proposed to do was: (1) Abandon for the time being its traditional "6–6" organization and operate at least for a time on a "6–3–3" basis; (2) Establish a single unitary high school on the formerly all white Dollarway campus in which instruction would be offered to students in Grades 10–12, the high school to be put into operation this year; (3) To use for purposes of assigning students in Grades 1–9 the same attendance zones that the Court had disapproved a month earlier. A study of the report attached to the Board's resolution indicated that the Board's committee, the Superintendent of Schools, the administrative staff, and counsel for the Board desired to continue "in transition" for at least one more year and perhaps longer.

On May 7 the Court on its own motion filed a letter opinion disapproving the new plan. The Court found that the plan would not disestablish the dual school system at the elementary and junior high school levels this year. The Court also found that the plan was completely lacking in specificity with respect to faculty desegregation and based on its past experience with the District the Court predicted that should the plan be approved it would produce only token faculty desegregation which the Court had held earlier to be unconstitutional.

The Court then proceeded to suggest the possibility that the schools might be integrated by pairing grades and suggested certain possible pairings. The Court recognized that from an educational standpoint the suggested plan might not be the best one for the District but that it was a plan, and the Court stated that it would be ordered into effect unless the Board could come up with an acceptable alternative within a very short period of time.

That letter opinion evoked a new plan, which is now before the Court, and to which plaintiffs object. Counsel for both sides agreed that the Court might evaluate the plan on the basis of materials before it without hearing further evidence or calling for further briefs. The plan may be summarized as follows:

### 1969–70 School Year

*Grades 10–12:* All students in these grades to be assigned to Dollarway Schools without regard to race, residence, or choice.

*Grades 1–9:* All students in these grades to be assigned either to Dollarway Schools, including Pinecrest, or to Townsend Park Schools on the basis of residence, subject to limited options to be mentioned. Students residing east of the Missouri Pacific Railroad tracks are to be assigned to the Townsend Park (Negro) Schools; Students residing west of the tracks are to be assigned to the Dollarway-Pinecrest (formerly all white) Schools.

(a) Any student residing between the tracks and U.S. Highway 65 may attend either the Townsend Park Schools or the Dollarway-Pinecrest Schools, according to his choice.

(b) Any student assigned to a school in which members of his race

are in the majority may, at his request, be assigned to a school in which members of his race are in the minority.

*Faculty and Staff:* Teachers are to be assigned in such manner that no more than 75% of the teachers in any school will be members of the same race. Otherwise stated, at least 25% of the teachers in the Townsend Park Schools will be white, and at least 25% of the teachers in the Dollarway-Pinecrest Schools will be Negroes.

### 1970-71 School Years (And presumably future years).

*Grade 7-12:* All students in these grades will be assigned to the formerly all white schools without regard to race, residence, or choice.

*Grades 1-6:* All students in these grades will be assigned on the basis of the zones heretofore mentioned, with students to have the same assignment options as in 1969-70.

*Staff and Faculty:* No additional interracial assignments contemplated as of this time.

As far as the zones are concerned, the only differences between the present plan and the one that the Court rejected in March are that the special zone set up originally for the Pinecrest School has been eliminated, and that the boundary line between the Dollarway zone and the Townsend Park zone has been moved east from Highway 65 to the railroad tracks. The shifting of that boundary will serve to bring substantially more Negroes into the formerly all white schools; it will have little or no effect on assignments of white students to the Townsend Park Schools.

Taking up first the matter of faculty desegregation, the interracial assignments to be made this fall will not by any means bring about racial balance on the faculties of the District's schools, but the interracial assignments to be made are substantial and mark a very definite forward step for Dollarway. In view of the time element and certain other problems, the Court doubts that with respect to this year the Board could have made more interracial assignments than it has pledged itself to make. Hence, as far as 1969-70 is concerned, the Court will not disturb the Board's proposals with respect to faculties.

■ Next year will be another story. The Board will be ordered as of the beginning of the 1970-71 session to achieve complete desegregation of staffs and faculties and to maintain such desegregation in future years. The Court does not now undertake to tell the Board what "complete staff and faculty desegregation" is. The Court takes notice of the fact that certain Arkansas school cases, including the Little Rock case, are now on appeal to the Court of Appeals for this Circuit, and the Court recognizes that an appeal may well be taken in this case. It is the hope and belief of the Court that when the time comes for the Board to make staff and faculty assignments for next year, it and this Court will have clear appellate guidelines as to what this District and others in Arkansas must achieve ultimately in the field of staff and faculty desegregation.

Turning now to student bodies, the Court approves the plan for Grades 10, 11, and 12, which will be integrated fully on the Dollarway campus. The Court cannot approve the plan as it applies to the first nine grades of the schools.

From the Board's enrollment projections the Court finds that moving the zone boundary from Highway 65 east to the Missouri Pacific tracks will very substantially increase the number of Negro students assigned to the formerly all white elementary and junior high schools. Under the plan which the Court rejected in May only 268 Negroes would have been assigned to those schools. Under the present plan the number is 465. According to the Board, 1125 white students will be assigned to those schools so that it appears that Negroes will make up about 29% of the total enrollment. In a District in which

Negro students slightly outnumber white students a 29% enrollment of Negroes in formerly all white schools is certainly not racial balance, but it is more than tokenism.

But, the use of the railroad track as the zone line will put only 70 white students in the Townsend Park Junior High School and in the Townsend Park Elementary School, assuming that those white students attend those schools, which may be unlikely. Only 20 white students are to be assigned to Townsend Park Junior High School the projected enrollment for which school is 311, and only 50 white elementary students will be assigned to Townsend Park Elementary which has a projected enrollment of 650 students.

In view of the very limited assignments of white students to the Townsend Park complex, and in view of the fact that the faculty of the Townsend Park schools will be 75% Negro, it cannot be gainsaid that the Townsend Park schools will be clearly identifiable as Negro schools this year, and under ruling decisions that is unconstitutional.

The situation could be rectified at the junior high school level if the Board were in a position to put all of the students in Grades 7–9 on the Dollarway campus this year instead of next year, thus reestablishing at once the "6–6" system under which this District has operated heretofore.

However, from materials before it the Court finds that for financial and other reasons the Board is simply not in a position to take that step efficiently, if at all, and at this time the Court is not willing to order the Board to do so. It is understood, however, that all students in the junior high grades are to be on the Dollarway campus next fall.

Speaking of the zones that were disapproved in March, the Court said: (p. 409 of 297 F.Supp.)

"If the racial nature of this case could be ignored, and if the District's schools could be viewed simply as 'schools,' and the inhabitants of the District simply as 'people,' the Court would have little, if any, trouble with the zones established by the plan.

"As stated, the Dollarway complex is located about a mile west of the Townsend Park complex, and the Pinecrest School is located a few hundred yards west of the Dollarway campus. Thus the schools are on an almost direct east-west axis. In view of the direction of that axis, and in view of the fact that the District proper is bisected roughly by the north-south running Highway and railroad tracks, it is obviously logical, apart from considerations of race, to assign students, particularly elementary students so as to avoid insofar as possible the necessity of their crossing the Highway and the tracks in going to and returning from school.

"With particular regard to the Pinecrest zone, Zone 5, it appears that that zone is quite small in comparison with the Dollarway Elementary and Townsend Park Elementary zones. However, if it is kept in mind that it is intended that all Hardin Area students in the first five grades are to be assigned to Pinecrest, and that the 'logical' school for those students to attend is Pinecrest, the Court cannot say that Zone 5 was not laid out rationally.

"But, the racial nature of the case cannot be ignored. It cannot be overlooked that the District's schools are not just 'schools' and that the inhabitants of the District are not just 'people.' The schools of the District are still racially identifiable, and the people of the District consist of whites and Negroes who, in general, live in different parts of the District."

Just as the Court considered that, race aside, Highway 65 was a rational attendance zone boundary, so the Court thinks that the Missouri Pacific Railroad track is a rational boundary; and, as has been seen, the adoption of the track as the boundary will serve to bring more Negro students into the for-

merly all white schools, but that is all that it will do.

The Court has given very careful consideration to the map submitted by the Board which depicts the track as the boundary and has made serious efforts to hit upon some rational alternative boundary that would put more white students into the Negro schools without taking any substantial number of Negroes out of the white schools. The Court's efforts have not been successful, and the Court is convinced that no rational attendance zones can be laid out that will not leave the Townsend Park schools identifiable as Negro schools or that will achieve substantial racial balance in the Dollarway schools and in Pinecrest without intolerable overcrowding of those schools accompanied by a corresponding underuse of the Townsend Park facilities. Indeed the Court doubts that even gerrymandered geographical zones would achieve those objectives.

This case, then, like others now pending, presents the question of the constitutional permissibility of geographical attendance zones in school districts having segregated housing and where the schools have been built in accordance with the neighborhood school concept, and where student assignments on the basis of zones will cause the schools to mirror the racial make-ups of the neighborhoods.

That question, which has not been answered yet by the Supreme Court of the United States or by the Court of Appeals for this Circuit, was before the Court of Appeals for the Fifth Circuit quite recently in a case involving the public schools of Clarksdale, Mississippi. Henry v. Clarksdale Municipal Separate School District, 5 Cir., 409 F.2d 682.

The physical situation existing at Clarksdale closely resembles the situation that exists at Dollarway. Clarksdale is bisected from northeast to southwest by the main line of the Illinois Central Railroad; traditionally, most Negroes have lived south of the tracks and most of the whites have lived north of the tracks. The school board laid out its zones so that no child would have to cross the tracks in going to and from school. The result was token integration only. 409 F.2d at 685–686.

It was found that the zones had been created in good faith and by reference to facially valid criteria, namely, maximum utilization of school buildings, density of population, proximity of students to schools, natural boundaries, and welfare of students.[2] However, the majority of the Court of Appeals held that the school board at Clarksdale had overlooked a sixth criterion, promotion of desegregation, 409 F.2d at 688, and reversed the decision of the District Court approving the zones. The view was taken that where geographical zones fail to produce anything but token desegregation, the affected school district should consider "redrawing its attendance-zone boundaries, incorporating a majority-to-minority transfer provision in its plan, closing all-Negro schools, consolidating and pairing schools, rotating principals, and taking other measures to overcome the defects of the present system." 409 F.2d at 690. With particular reference to attendance zones the Court said, ibid.:

" 'Zone boundaries or feeder patterns designed or used to perpetuate or promote segregation shall be discontinued, and such zone lines shall be withdrawn, wherever feasible, to maximize desegregation or eliminate segregation. No zone boundaries or feeder patterns which maintain what is essentially a segregated school structure shall be used.' Braxton v. Board of Public Instruction of Duval County, M.D.Fla.1967, F.Supp."

In the Clarksdale case it was argued with respect to the railroad tracks as it has been argued here with respect

2. 409 F.2d at 687. With regard to the fifth criterion, "welfare of students," the Court said that that criterion required

consideration of attractive nuisances and health hazards. Ibid.

to both Highway 65 and the railroad track that those phenomena presented hazards to children having to cross them. The Court had this to say about the hazards, 409 F.2d at 687–688:

"* * * Finally, safety hazards may be applicable to students of various ages in differing degrees, and the history of community action vis-a-vis those hazards should be taken into consideration. No one doubts the relevance of such criteria. But a relationship otherwise rational may be insufficient in itself to meet constitutional standards—if its effect is to freeze-in past discrimination * *."

And with regard to the use of the railroad track as the zone boundary, the Court noted, 409 F.2d at 688, fn. 10:

"For example, while the use as a boundary of the elevated railroad tracks in Clarksdale would appear reasonable, such appearance must be measured against the past history of school children crossing those tracks to go to a school for their particular race. Having disregarded the tracks as impediments in order to maintain the racial purity of its schools, the school board cannot turn around and consider the tracks impenetrable when doing so will perpetuate that former racial purity * * *."

This Court is not bound by the decisions of Courts of Appeals for other Circuits, but in the area of school desegregation, as the Court said recently in a somewhat different context, the Court does not know that there is any real reason to believe that the views of our Court of Appeals will differ substantially from those of the Court of Appeals for the Fifth Circuit or from those of other federal appellate courts dealing with school integration cases. See McBeth v. Board of Education of the DeVall's Bluff Public School District No. 1, E.D.Ark., 300 F.Supp. 1270, at 1275–1276.

Until recently the Court probably would have considered constitutionally adequate the Dollarway plan for a unified junior-senior high school with neighborhood schools for Grades 1–6. But, at this stage of appellate interpretation of constitutional mandates, and at this late date for Dollarway integration the Court is not willing to put its stamp of approval on the District's zones either as an interim plan for Grades 1–9 for this year or as a permanent plan for Grades 1–6 in later years.

This District has been on notice since July 1968 that it was required to disestablish its dual school system effective this year, and the zones simply will not accomplish that objective. In view of that notice and in view of the long history of this litigation the Court thinks that the onus of securing approval of the zones from the Court of Appeals should be placed on the District rather than that the onus of securing disapproval of them from that Court should be placed on the plaintiffs.

The Court will order the Board, by whatever means it chooses to employ, to assign no less than 200 white students, exclusive of students who may live between the Highway and the railroad track and who may be expected to choose to go to Dollarway or Pinecrest, to the Townsend Park complex. If it cares to do so, the Board may redraw its attendance zones, it may pair grades, or it may assign the Hardin Area students, who are already bussed to school by the District, to Townsend Park; or it may use a combination of those methods. And the Board will be required to report to the Court within the next two weeks what step or steps it proposes to take to comply with the Court's order.

If 200 white students are put into the Townsend Park schools, the total enrollment of those schools will be 1161 so that the white enrollment will constitute about 23% of the total enrollment. And if at least 130 white students[3] are taken out of the white schools and are sent to Townsend Park, the Negro enrollment in the formerly all white junior

3. 200 less the 70 students presently residing in the Townsend Park zones.

high and elementary grades will amount to 32% of the total enrollment in those grades.

It is evident that assigning 200 white students to Townsend Park may not be a permanent solution to the District's problem, but the Court thinks that it is a tolerable solution for the 1969–70 school year. As stated heretofore, next year all of the junior high school students will be at Dollarway, and they will constitute a fully integrated student body. By that time the Board will have had to find an acceptable permanent solution with respect to its elementary students. What it must do with regard to those students will naturally depend in large measure, if not entirely, on what the Court of Appeals has to say about residential zoning in districts having residential segregation patterns, and the District may well have to devise a new plan for the elementary students for 1970–71 and later years after ruling appellate decisions have been rendered. In due course the Court will direct the submission of a new plan if such action appears necessary or appropriate.

■ When this case was before the Court in 1968 the Court allowed counsel for plaintiffs a fee of $700; the Court of Appeals allowed no additional fee. This Court did not allow a fee with respect to the phase of the case which resulted in its March 1969 decision. The Court now considers that an additional fee should be allowed to compensate counsel for their services between the affirmance of the Court's 1968 decision and the rendition of the decree about to be entered and fixes that fee in the sum of $1,000.

This memorandum is being filed in late July, and school will open in about six weeks. The order to assign at least 200 white students to the Townsend Park schools will affect a substantial percentage of the District's white junior high school and elementary students; it may affect the Hardin Area students as a class. The Court has doubt as to how the Court of Appeals will answer the question of the permissibility of geo-graphical attendance zones in districts like Dollarway; and the action being taken in this case is different from that being taken in the North Little Rock case that has been mentioned.

In such circumstances if the District desires to appeal and to apply to this Court for a stay, the Court will stay that portion of its decree ordering the assignments to Townsend Park. The initial period of the stay will expire on August 30, 1969. However, if in the meantime the District applies to the Court of Appeals for a further stay, this Court's stay will remain in effect until the Court of Appeals acts on the application. The Board is warned, however, that unless when school opens this fall the District is under the protection of a stay, either that of this Court or that of the Court of Appeals, there must be compliance with the decree about to be entered herein.