Carnell **GRAVES**, Richard J. Graves, Vickie Ann Graves, Meredith D. Graves, Debra M. Graves, and Kevin R. Graves, minors, by their father and next friend, Floyd Graves, Plaintiffs,

v.

**BOARD OF EDUCATION OF the NORTH LITTLE ROCK, ARKANSAS, SCHOOL DISTRICT, a public body corporate, and F. B. Wright, Superintendent of Schools of the North Little Rock School District, Defendants.**

No. LR–68–C–151.

United States District Court
E. D. Arkansas, W. D.

July 25, 1969.

John W. Walker, Little Rock, Ark., for plaintiffs.

Robert V. Light, Little Rock, Ark., for defendants.

## MEMORANDUM OPINION

HENLEY, Chief Judge.

On August 8, 1968, Negro patrons of the Public School District of the City

of North Little Rock, Pulaski County, Arkansas, filed this suit against the Board of Directors of that District and the Superintendent of Schools to compel integration of the public schools.

The Board answered in due course and came forth with a desegregation plan. The plan contemplated that students in the first six grades would continue to be assigned to schools on the basis of freedom of choice, and that students in the upper six grades would be assigned on the basis of geographical attendance zones. It was further contemplated that the top three grades of the all-Negro Scipio A. Jones High School would be phased out over a one year period with the 10th grade being eliminated this fall and with the 11th and 12th grades being eliminated as of the close of the 1969–70 school year.[1] As to faculty the plan was nothing more than a pledge that the District would refrain from racial discrimination in hiring, compensating, promoting, demoting, and discharging professional employees, and that reductions of force caused by desegregation would be handled in a racially nondiscriminatory manner.

The case was tried to the Court and on April 29, 1969, the Court filed a memorandum opinion and entered a decree. The District was enjoined mandatorily to disestablish effective this year its existing dual system of racially identifiable schools and to replace it with a unitary integrated system. Specifically, the Court approved the attendance zones for junior and senior high school students and the phase out of the senior high school grades at Jones. The Court disapproved the freedom of choice plan for elementary students and found that the plan was inadequate as far as staff and faculty were concerned. Graves v. Board of Education, E.D.Ark., 299 F.Supp. 843.

Pursuant to the directive of the Court, the Board filed on May 14, 1969, a new plan proposing to assign elementary students by zones and giving its projections for elementary school enrollments this year based on the zones. The plan was accompanied by a map showing the zones as laid out by the Superintendent of Schools and approved by the Board.

On May 23 plaintiffs objected to the plan contending that it will leave the elementary schools still racially indentifiable. Plaintiffs also objected to the plan's provisions for staff and faculty desegregation and renewed their objections to the phasing out of Grades 10–12 at Jones.

Three days later plaintiffs filed a motion requesting an evaluation of all employees of the District and their assignment to schools and courses on the basis of qualifications and objective criteria.

On June 9 a number of patrons of the District, some of them white, moved for leave to intervene in the case alleging that their interests would not be adequately represented by either side. On June 19 the defendants objected to the proposed intervention, and the Court reserved ruling until the new plan should be heard on the merits.

A plenary hearing was held on June 25 and June 27. Plaintiffs, defendants, and the would-be intervenors were all represented. At the commencement of the hearing the Court indicated that it was still reserving ruling on the motion for leave to intervene, but that any patron desiring to be heard would be permitted to testify, and some patrons availed themselves of the opportunity. The Court also announced that it would consider the views expressed by certain patrons in letters addressed to the Court.

In the course of the hearing counsel for plaintiffs moved orally that three athletic coaches now employed at Jones be permitted to intervene for the purpose of protecting their employment

---

[1]. The opening of school for the 1969–70 session is imminent, and the 1969–70 school year will at times be called "this year." The 1970–71 school year will be called at times "next year."

rights; ruling on that motion was reserved.

About a week after the hearing counsel for plaintiffs with leave of Court filed a memorandum suggesting some changes in the boundaries of the zones established for four elementary schools but stipulating that plaintiffs would not be satisfied even if the suggestions were adopted.

On July 15 counsel for the defendants responded to plaintiffs' memorandum and objected to the proposed changes; counsel also furnished the Court with some admittedly incomplete and inaccurate enrollment projections should plaintiffs' proposed changes be adopted. Without stopping to elaborate, the Court will say that the District's objections to the changes appear valid; and in view of the fact that plaintiffs would not be satisfied even if the changes were made, the Court will confine its consideration to the zones proposed by the Board.

Certain issues tendered by plaintiffs and would-be intervenors are not without importance, but they are subordinate to the basic problem with which the Court and the District are confronted.

The basic issues in this case are generally similar to those presented in the Dollarway School Case, this day decided, Cato v. Parham, E.D.Ark., 302 F.Supp. 129, and the Court considered the two cases at the same time. The Court would suggest a reading of the Cato opinion, supra, before further consideration of this opinion. However, the Court will observe that there are distinctions between the situations of the two Districts which are mentioned in the Dollarway opinion and which will also be mentioned at a later point in this opinion. And it should be kept in mind that in the last analysis each school desegregation case must be decided in the light of its own facts and circumstances.

The Court's original opinion in this case approving the senior and junior high school zones was filed prior to the publication on June 30 of the opinion of the Court of Appeals for the Fifth Circuit in Henry v. Clarksdale Municipal Separate School District, 409 F.2d 682.

A reading of that opinion has caused the Court to reconsider its approval of the high school and junior high school zones in North Little Rock, and for reasons to be stated the Court adheres to its original ruling as far as those two sub-systems are concerned. The Clarksdale opinion is discussed in some detail in Cato, supra, and that discussion will not be repeated in this opinion.

For a description of the defendant District, including its geography, population distribution, and desegregation, reference is made to the Court's April opinion.

## I.

As to the elementary school zones, the record reflects that during the 1968–69 school year the District operated 21 elementary schools with students being assigned to particular schools on the basis of freedom of choice. The Board now proposes to close the old Riverside School in the southern part of the City, and to assign students in the remaining 20 schools on the basis of the zones here in question.

The District projects that this year it will offer instruction to 7581 children in the elementary grades. Of those children 5761 (76%) will be white and 1820 (24%) will be Negroes. The District employs 293 elementary teachers, Of those teachers 187 (63%) are white, and 106 (37%) are Negroes. While substantial numbers of white teachers will be assigned to all Negro or formerly all Negro elementary schools, and while substantial numbers of Negro teachers will be assigned to all white or formerly all white elementary schools, Negroes will make up the majority of faculties at all of the "Negro schools," and whites will constitute the majority of faculties at all of the "white schools."

As to elementary student assignments based on the zones, the Board's figures indicate that ten of the 20 elementary schools, most of which are located in the

northern part of the City, will have no Negro students this fall, and that the Carver Elementary School located in the southern part of the City will have no white students. Figures for the remaining nine schools are as follows:

| School | White Students | Negro Students | Minority % |
|---|---|---|---|
| Baring Cross | 175 | 5 | 3 |
| Clendenin | 238 | 77 | 24 |
| Lincoln | 180 | 392 | 31 |
| Lynch Drive | 474 | 2 | .4 |
| McRae | 357 | 10 | 3 |
| Meadow Park | 246 | 30 | 11 |
| Roosevelt | 11 | 287 | 4 |
| Rose City | 487 | 19 | 4 |
| Woodson | 11 | 536 | 2 |

The Court has considered the evidence with respect to the zones and has carefully examined the map supplied by the Board. The Court credits the testimony of Superintendent Miller that the zones were laid out in good faith and by reference to size of the schools, their location, the number of classrooms and teaching stations, density of population, and features of terrain like arterial streets and highways and railroad tracks. The zones were designed to make efficient use of the several school plants without overcrowding individual schools.

The Court finds that the zones were laid out in accordance with the neighborhood school concept, and that they were not gerrymandered either to promote integration or to preserve segregation. However, due to racial segregation in housing in North Little Rock the very fact that the elementary schools were built in accordance with the neighborhood school concept assures that the schools will mirror the racial make-ups of the neighborhoods that the schools were located to serve.

Moreover, the Court finds that due to segregated housing patterns throughout the City there are no rational zones that can be laid out that will bring substantial numbers of Negroes into the schools located in the northern part of the City or that will achieve substantial racial balance in any of the above listed schools,

other than Clendenin, located in the southern part of the City. As far as the Carver School is concerned, the problem is complicated by the fact that some years ago the Housing Authority of North Little Rock deliberately located a low rent housing project, still occupied solely by Negroes, in the immediate vicinity of that school.

We thus have at North Little Rock an elementary school sub-system in which exactly one-half of the schools are all white, one is all Negro, one has a substantially racially balanced study body, and eight are obviously predominantly either white or Negro schools taught by obviously predominantly white or Negro faculties.

Thus, this case presents much the same basic question presented at Dollarway as to whether geographical attendance zones based on the neighborhood school concept are constitutionally permissible in districts having racially segregated housing, a question that is still open in this Circuit.

In Henry v. Clarksdale Municipal Separate School District, supra, a majority of the Court of Appeals disapproved geographic zoning in Clarksdale, Mississippi, where the zones laid out by the school board were rational but produced only token desegregation. While the Clarksdale situation resembles that which

exists at Dollarway more closely than it does that which exists in North Little Rock, the appellate court's approach to the problem and the language of the majority opinion are as applicable to North Little Rock as they are to Dollarway.

It is evident that geographic zoning will not desegregate elementary schools to the extent that it will desegregate junior high schools and senior high schools; that is true because the neighborhood school concept relates primarily to elementary students. Elementary schools are located under that concept as close as possible to the homes of the children to be served. In locating junior and senior high schools school authorities are less concerned with where the children are.

Such has turned out to be the case in North Little Rock. The high school zones will integrate the two high schools by next year; and the junior high school zones will in the Court's opinion disestablish a segregated junior high school sub-system although there will be some junior high schools that will have no Negro students and there will not be racial balance in all of the desegregated junior high schools. See Graves v. Board of Education, supra, 299 F. Supp. at 843. But, with respect to the elementary schools the Court must find that the entire elementary sub-system will remain basically segregated.

In approving the high school and junior high school zones the approach of the Court was that the high school grades, the junior high school grades, and the elementary grades of an overall school system may properly be considered as identifiable sub-systems. In its April opinion the Court recognized that it had no idea at the time as to how much integration zoning would effect at the elementary grade levels.

The Court adheres to its view that the Constitution does not require that every school in a sub-system be integrated, but feels that it must hold that a zoning plan which leaves an entire sub-system essentially segregated cannot be approved. Therefore, the North Little Rock zones for the elementary grades cannot be approved as have been the junior and senior high schools zones.

Alternatives to geographical zoning for elementary schools are not attractive in North Little Rock or anywhere else. Aside from the constitutional requirement of affirmative integration in States where segregated schools were established originally by law, there is no question that the neighborhood school concept is an educationally valid one and has been followed and is being followed all over the United States regardless of the racial make-ups of respective neighborhoods. However, North Little Rock is subject to the requirement just mentioned, and the Board is ultimately going to have to devise another method for assigning elementary students to particular schools.

In the absence of controlling appellate guidelines which may be expected shortly the Court will not at this time undertake to tell the Board with any degree of specificity what it is going to have to do in the long run.

An examination of the Board's map makes it clear that getting Negro students into all of the elementary schools of the District or achieving racial balance in all of those schools will require a massive transportation or movement of students all over the City. Many of the elementary school children have to walk to school; the existing public transportation system in North Little Rock is not adequate to get the children to and from school; the District itself has never transported any students; it has no busses and no funds present or prospective with which to buy or lease busses.

In its April opinion the Court said that it did not believe that the Constitution requires that students be transported for unreasonable distances or be subjected to inconveniences, hardships, or hazards merely for the sake of integration and without regard to resulting adverse effects on the children and on a school district's educational program

itself. Graves v. Board of Education, supra, 299 F.Supp. at 843. The Court hopes that its view will prevail at the appellate level, and the Court observes that the inconveniences and hardships of tiaveling long distances from home to school and back may well bear more heavily upon Negro children as a class than they will upon white children as a class.

It does appear to the Court from the map that there are a number of elementary schools in the southeastern part of the City that are fairly close to each other and which reflect very substantial racial imbalances under the zoning plan; and it occurs to the Court that that group of schools offers pairing possibilities which the Board would do well to consider. For example, it is possible that the Rose City School could be paired with the Roosevelt School or the Woodson School with a minimum of hardship to the students involved.

That, however, is for the future. The immediate problem before the Court is whether the Court should permit elementary students to be assigned for this year in accordance with the zones or whether it should order the Board to take affirmative action at the elementary grade levels with respect to this year. It is at this point that the distinctions between North Little Rock and Dollarway become of crucial importance.

The Dollarway District has been in litigation for about eleven years and has stubbornly resisted integration; it has been on notice since the summer of 1968 that it would be required to establish a unitary school system as of the opening of school this year. It has few schools, and the organization of the District is simple. A feasible alternative to attendance zoning was pointed out to the Dollarway Board in the Court's opinion rendered in March of this year when the Court rejected the Board's original zoning plan. Cato v. Parham, E.D.Ark., 297 F.Supp. 403. Further, the Dollarway District owns a number of school busses and transports a substantial number of students to the schools located in the

District proper from the outlying Hardin Area several miles distant from the schools. The Dollarway District can largely comply with today's order of the Court by simply assigning the Hardin Area students to the Townsend Park schools.

■ The situation at North Little Rock is quite different. It does not have the litigious history of Dollarway; it has many schools and many students; the opening of school is imminent; according to counsel the summer staff of the District is minimal; as stated, the District owns no busses and has no means of obtaining any either on short or long notice. Further, what the District is going to have to do ultimately in the way of student assignments is highly uncertain.

In all the circumstances, the Court in the exercise of its discretion will permit the use of zones for elementary students for this year only.

## II.

■ As far as faculty is concerned, the Board proposes for this year to assign, with one exception, teachers to the schools at the junior and senior high levels so that there will be not less than 15% Negro teachers or more than 85% Negro teachers in each school. The exception is the present North Little Rock Senior High School the name of which is about to be changed or has been changed to Southwest High School. To that school the Board proposes to assign 82 white teachers and five Negro teachers. The Board explains that exception by pointing out that "so many Negro teachers are being displaced from Jones Junior-Senior High School into other schools to achieve the projected ratio in those schools that further dislocation of incumbent teachers at Jones would severely impair the stability of the faculty there." The Board then goes on to say that when the phase out of the senior high grades at Jones is completed at the end of this year, the teachers there will be reassigned to the two remaining high schools, Northeast and

Southwest, so that there will result an essentially balanced dispersal of the Negro junior and senior high school teachers among the schools of the District.

As to the elementary schools the Board proposes for this year to assign teachers so that there will be not less than 25% Negro teachers or more than 75% Negro teachers in each school.

With regard to the administrative level, the Board states that two of its four social workers are Negroes, and that the social workers are assigned to schools without regard to race of students or faculty. The Board also states that it has employed a Negro to be the District's Supervisor of Physical Education; that all other administrative posts are presently filled with qualified personnel, and that future vacancies will be filled by recruiting and employing personnel without regard to race.

The situation just described clearly does not amount to any complete desegregation of staff and faculty, but it does mark very substantial progress, and in view of the short time between now and September, the Court will not insist on further progress for this year.

As to the future, what was said in *Cato* is applicable here:

"Next year will be another story. The Board will be ordered as of the beginning of the 1970–71 session to achieve complete desegregation of staffs and faculties and to maintain such desegregation in future years. The Court does not now undertake to tell the Board what 'complete staff and faculty desegregation' is. The Court takes notice of the fact that certain Arkansas school cases, including the Little Rock case, are now on appeal to the Court of Appeals for this Circuit, and the Court recognizes that there may be an appeal in this case. It is the hope and belief of the Court that when the time comes for the Board to make staff and faculty assignments for next year, it and this Court will have clear appellate guidelines as to what this District and others in Ar-kansas must achieve ultimately in the field of staff and faculty desegregation."

Looking beyond this year, Superintendent Miller testified that the District would achieve complete faculty desegregation when it could find out what that is. As indicated, the Court is not prepared to define that term at this time. However, the record before the Court contains some rather detailed figures about the racial make-up of the District's faculties and some observations based on those figures are perhaps warranted at this time.

The student enrollment of the entire District is somewhat less than 25% Negro. Assuming that the District will be required to achieve racial balance of faculty in all schools regardless of the race of the students attending particular schools, and assuming further that faculty racial balance is to be measured by reference to the percentage of Negro *students* in the entire District, then, subject to permissible tolerances and variations, there ought to be about three white teachers for every Negro teacher in each of the schools of the District.

If in achieving faculty balance the number of Negro *teachers* is to be compared with the number of white *teachers* in the District, a different ratio would seem to be required. The District employs 563 teachers; 69% of those are white, and 31% are Negro. And the ratio in round numbers would be seven white teachers to every three Negro teachers in each school.

As things will stand this year, a majority of the teachers in the Negro schools will be Negroes, and a majority of the teachers in the white schools will be white. It would seem to the Court, in the absence of more precise guidelines, that the minimum that the Board will have to achieve for next year is to establish a situation in which at least a majority of the teachers in all of the schools will be white, and then go on from there. Further, it would seem that next year the Board will have to be prepared to assign at least one Negro prin-

cipal to a white school, and at least one white principal to a Negro school.

On this phase of the case plaintiffs complain, at least to some extent, that the Negro teachers who have been assigned to the white schools are capable and experienced teachers whereas white teachers assigned to the Negro schools are at least inexperienced.

There is no evidence here that would justify any inference that the Board and the Superintendent are deliberately stripping the Negro schools of good teachers or are deliberately foisting off incompetent white teachers on Negro students, or that they have ever knowingly hired any incompetent teacher to teach any student either black or white.

While teaching experience, of course, is a factor to be considered in weighing the competency of a teacher, the Court is not at all sure that young white teachers recently out of school and necessarily "inexperienced," who are ready and willing to teach in integrated situations, will not do better jobs in such situations than some experienced white teachers whose racial attitudes have hardened and who have been assigned more or less against their will to teach classes in which Negro students are in the majority.

In any event, the Court does not think that now is the time or that this is the case to go into questions of the competency of individual teachers or of the propriety of individual teacher assignments granting that such questions may in some circumstances be of constitutional significance.

The Court does not know what teacher resistance, if any, the Board will encounter in making interracial assignments of staff and faculty for next year. The Court will repeat its April admonition that the District's obligation to desegregate its staff and faculty does not depend upon the willingness of individual employees to accept interracial assignments. To assist the District in dealing with teachers in the future, the Court will enjoin the District from entering into any employment contract for next

year and for future years that does not contain an express agreement on the part of the employee to accept assignment to a school in which members of his or her race are in the minority either from the standpoint of faculty or student body, or both; and the Board and Superintendent will be expected to insist in good faith on the observance of those agreements.

### III.

Over the objection of plaintiffs, the Court adheres to its view that the District should be permitted to keep open the 11th and 12th grades at Jones High School for the 1969–70 school year.

However, the Court realizes that this permission may place in some hazard the positions of certain personnel who will be employed at that school during the coming year, and believes that they are entitled to some protection in their tenure as employees of the District.

The Board has pledged itself to refrain from racial discrimination in connection with reductions of force that may be necessary or possible in the course of desegregation. That pledge, of course, is applicable to the phasing out of the Jones High School, and was mandatory in the light of such judicial decisions as Walton v. The Nashville, Arkansas Special School District No. 1, 8 Cir., 401 F.2d 137; Smith v. Board of Education, Morrilton Special School District No. 32, 8 Cir., 365 F.2d 770; Brooks v. School District of the City of Moberly, 8 Cir., 267 F.2d 733.

In its quite recent decision in McBeth v. The Board of Education of the De-Vall's Bluff School District No. 1, E.D. Ark. 300 F.Supp. 1270, this Court held that a Negro teacher threatened with termination in connection with school integration is entitled to have his qualifications, paper and other, evaluated objectively and without regard to race in comparison with other teachers teaching in a field or in fields in which he is qualified to teach, and to replace another teacher if better qualified. The Court found that the DeVall's Bluff District

had discriminated against two Negro employees and ordered the Board to offer them reemployment.

The decree to be entered will enjoin the Board and Superintendent and subordinate employees from practicing any racial discrimination against any employee at the Jones High School with respect to continued employment by the District after the closing of Grades 11 and 12 at that school. And the Board will be ordered to make a proper objective evaluation of all Jones High School personnel, including the principal, coaches, band director, and the like, before entering into employment contracts for next year.

At an appropriate time the Board will be called upon to submit a report dealing with overall faculty assignments for next year, and that report is to include a statement as to what is to be done with respect to all Jones employees whose jobs at that school will cease to exist in May 1970.

The Court thinks that those provisions of the decree will adequately protect at this time the rights of the three coaches who desire to intervene in the case, and that their motion for leave to intervene should be denied. They still have their jobs for 1969–70, and they may be offered acceptable positions in the District for the 1970–71 school year.

### IV.

There remains for consideration the motion for leave to intervene filed by the school patrons who claim that their interests are not properly represented by either the plaintiffs or the defendants.

The white patrons who testified and who wrote letters to the Court about the elementary attendance zones do not object to integration as such. They object to their children being required to walk comparatively long distances to and from school as a result of the closing of Riverside, and to the fact that so few white students will be assigned under the zones to the Roosevelt and Woodson Schools.

As far as the closing of Riverside is concerned, the Court did not order Riverside closed, and finds that desegregation had nothing significant to do with the closing. The school was old and in all probability would have been closed anyway on the basis of a recommendation appearing in the 1966 Peabody Report on the North Little Rock schools. The Court does not know what effect keeping Riverside open would have had on the integration picture in the southern part of North Little Rock. The Court does not find that it is in a position to interfere with the Board's decision relative to the school.

The Court is not unsympathetic with the other complaints, but there is nothing that the Court is willing to undertake to do about them with respect to this year. Next year, the children involved may get some relief when certain of the elementary attendance zones are abandoned, if they are abandoned.

The motion just discussed will be denied.

A decree in accordance with the foregoing will be entered.

Costs and an attorney's fee of $750.00 will be assessed against the District.