**Samuel Wayne CATO et al., Plaintiffs,**

**v.**

**Lee PARHAM et al., Defendants.**

**No. PB–67–C–69.**

United States District Court
E. D. Arkansas,
Pine Bluff Division.
March 26, 1969.

George Howard, Jr., Pine Bluff, Ark., Barbara A. Morris, New York City, for plaintiffs.

Robert V. Light, Little Rock, Ark., for defendants.

## MEMORANDUM OPINION

HENLEY, Chief Judge.

This school desegregation case involving Dollarway School District No. 2, Jefferson County, Arkansas, is before the Court on the School Board's latest plan to desegregate the District's schools. The Board now proposes to assign students on the basis of residential attendance zones to be described. The plaintiffs, Negro students and patrons of the District, object to the Board's proposal contending that it will perpetuate de facto racial segregation. Plaintiffs urge that the District's schools be

restructured so that all students in the elementary grades, 1–6, will receive instruction at the formerly all white Dollarway School complex and so that all students in the secondary grades, 7–12, will receive instruction in the still all Negro Townsend Park school complex. Plaintiffs further propose that the Pinecrest Elementary School be used as a facility for providing special instruction to students in need thereof. Defendants contend that the proposals of plaintiffs are not feasible.

The matter has been tried to the Court, and this memorandum incorporates the Court's findings of fact and conclusions of law.

On July 25, 1968, the Court filed a memorandum opinion and entered a decree permitting the District to continue to operate throughout the current school year on the freedom of choice method of student assignments. However, the Court found that freedom of choice had not proved and would not prove effective as a method of disestablishing the unconstitutional dual system of racially identifiable schools which has existed in the District and replacing it with a unitary system of schools not racially identifiable. And the Court ordered the Board to come up with a plan for a unitary system to go into effect in September of the current year. Cato v. Parham, E.D.Ark., 293 F.Supp. 1375.

Plaintiffs appealed from so much of the Court's decision as permitted the District to continue to operate under freedom of choice during the 1968–69 school year. On November 8, 1968, the Court of Appeals affirmed the ruling of this Court but made it clear that the dual system would have to come to an end with the opening of school in September 1969. Cato v. Parham, 8 Cir., 403 F.2d 12.

In connection with the appeal counsel for the District assured the Court of Appeals that the Board was considering a geographical zoning plan which would be free from "gerrymandering," and

that the Board would produce a plan for a unitary system. The Court of Appeals accepted that assurance. 403 F.2d at 16.

On November 29, 1968, the District filed a report setting forth the plan now under consideration and accompanied that report with maps showing the proposed attendance zones for secondary school students and the proposed zones for elementary school students. On December 10, 1968, plaintiffs filed their objections to the plan and their counter-proposals which have been described.

Before setting out and discussing the Board's plan it is necessary to describe the District and the racial distribution of its residents.

The Dollarway District which is located in the Dollarway community on the northern outskirts of the City of Pine Bluff consists of the District proper and the so-called Hardin Area which is located some miles to the northwest of the District proper. The Hardin Area takes its name from the Hardin community located on U. S. Highway No. 270 which runs between Pine Bluff and Sheridan. The Hardin Area is separated from the Dollarway District proper by portions of the White Hall School District. The history of the inclusion of the Hardin Area in the Dollarway District is that in 1948 the school or a school operated by the then Hardin School District was destroyed by fire; the patrons of the Hardin District decided to dissolve that District and asked that its territory be incorporated into the Dollarway District, which was done.

The Dollarway community derives its name from the old Dollarway Road which ran from Pine Bluff to Little Rock and which later became U. S. Highway No. 65. Highway 270 and Highway 65 unite in the northwestern part of the District and run together to the District's southern boundary. The parties have referred to the combined highways as "Highway 65," and the Court will so refer to them.

When Highway 65 reaches a point at which it intersects Blake Street, it turns due south and runs along that street to the southern boundary of the District. Blake Street itself runs along a north-south half section line. If that line is extended northward from the point where Highway 65 comes into Blake Street to the Arkansas River, the line, as extended, roughly bisects the District proper.

Highway 65 is an arterial thoroughfare bordered on both sides by commercial establishments of various kinds. It forms a logical boundary between what are roughly the east and west halves of the District proper. Somewhat to the east of the Highway are the tracks of the main line of the Missouri Pacific Railroad running from Little Rock to New Orleans. According to the Court's understanding, there are grade crossings over the railroad tracks but no overpasses or underpasses. It is recognized that both the Highway and the railroad tracks constitute hazards for young children going to and from school on foot.

Negroes residing in the District, including Negroes of public school age, slightly outnumber the white residents of the District, including white students. The residential pattern of the District is, and historically has been, racially segregated. The bulk of the white population resides west of Highway 65, and the bulk of the Negro population resides east of the Highway and east of the railroad tracks, and as one proceeds east in the direction of the Townsend Park schools the concentration of Negroes in comparison to whites becomes greater. There are small enclaves of Negroes who live west of the Highway, and small enclaves of whites who live to the east thereof; it is clear, however, that there are more Negroes living west of the

Highway than there are whites living east of the Highway. The population of the Hardin Area is made up almost entirely of white people.

Prior to the Brown decisions of 1954 and 1955 the District was required by Arkansas law to establish and operate separate schools for white and Negro students, and students were required to attend the schools set aside for members of their race.

Apart from that requirement, public schools in Arkansas, particularly elementary schools, have been located traditionally in accordance with the "neighborhood school" concept; that is to say, schools have been located in the vicinity of the homes of the children to be served. And that concept was followed generally in establishing racially segregated schools in districts in which the population was in fact racially segregated with identifiable Negro neighborhoods and identifiable white neighborhoods. The result was that in such a district Negro schools would tend to be established in Negro neighborhoods and white schools would tend to be established in white neighborhoods.

The schools of the defendant District were located in accordance with the concept and practice just mentioned. The Dollarway High School and the Dollarway Elementary School for white students were located on a single campus abutting Highway 65 on the west. The Townsend Park High School and the Townsend Park Elementary School for Negro students were located substantially to the east of the Highway. The two complexes are about a mile apart.

In later years, and apparently after this litigation had its genesis in 1959, the Pinecrest Elementary School was built on a site some distance west of the Dollarway School complex.[1]

---

1. The Court's earliest opinion in this case, which was then styled Dove v. Parham, written in 1960, makes no mention of Pinecrest; indeed, the Court stated that the only schools in the District were the Dollarway Schools and the Town-

send Park Schools. Dove v. Parham, E.D.Ark., 181 F.Supp. 504, 509, f.n. 2. As the Court now recalls, although not with great positiveness, there was a third elementary school in the District, possibly in the Hardin Area, during the

From 1959 through 1966 the Board undertook to comply with the mandate of *Brown* by applying assignment criteria to Negro students desiring to attend formerly all white schools; that application brought about a token desegregation of the Dollarway complex, but no white students ever expressed any desire to go to Townsend Park and none were ever sent there.

Under pressure engendered by the Civil Rights Act of 1964 the Board reluctantly adopted a limited freedom of choice plan for the assignment of students which this Court rejected on sight. The Board then adopted the plan under which it is presently operating. That plan has brought about a minimum of desegregation in the Dollarway complex and in the Pinecrest School, but the Townsend Park schools are still attended by Negroes only and are still identifiable as Negro schools.[2] It was in those circumstances that the Court struck down freedom of choice in 1968.

The Board's present plan sets up five attendance zones which the Court finds it convenient to identify as follows:

*Zone 1*: Dollarway High School (Grades 7–12).

*Zone 2*: Townsend Park High School (Grades 7–12).

*Zone 3*: Dollarway Elementary School (Grades 1–6).

*Zone 4*: Townsend Park Elementary School (Grades 1–6).

*Zone 5*: Pinecrest Elementary School (Grades 1–5).[3]

Under the plan, the boundary between Zone 1 and Zone 2 and between Zone 3 and Zone 4 is the north-south line of Highway 65 as extended north to the Arkansas River. Everything west of that line is in Zone 1 and 3, and everything east of the line is in Zone 2 and 4.

Zone 5 is itself a rectangular enclave within Zone 3 and lies, of course, west of Highway 65. Zone 5 is bounded on the south by the south line of the District, on the west by the west line of the District, and on the north by the north line of the District. The east line of the zone consists of Hutchinson Street from Cheatham Street to the south line of the District. Hutchinson Street is a major street and like Highway 65 runs along a half section line.

Students will be assigned under the plan as follows:

All secondary students and all elementary students residing in Zones 1 and 3 will attend either Dollarway High School or Dollarway Elementary School. Secondary students residing in Zone 5 will go to Dollarway High School. Zone 5 elementary students in grades 1–5 will attend Pinecrest School; Zone 5 elementary students at the sixth grade level will go to Dollarway Elementary School.

All students in Zone 2 and Zone 4 will be assigned to the Townsend Park complex.

early stages of the litigation, but it was not a significant factor in the desegregation equation at that time. The Court never heard of Pinecrest until about 1967 when the controversy was reactivated having lain dormant for several years.

2. With respect to the District's enrollments during the current school year, figures supplied by the Board reflect that 1628 students, all Negroes, are enrolled in the Townsend Park complex, and that 1627 students are enrolled in the Dollarway complex and in the Pinecrest School. Of those 1627 students, only

67 are Negroes; of those, 34 are in attendance at the Dollarway Elementary School; 2 go to Pinecrest, and 31 go to Dollarway High School.

3. The numbers which the Court has assigned to the zones are the Court's; they do not appear on the maps filed by the Board depicting the District's plan. Understanding of those maps is facilitated by consulting in connection with them the map of Pine Bluff and its environs which appears on the reverse side of the 1968 Arkansas State Highway Map, an official publication of the Arkansas State Highway Department.

Hardin Area students in grades 7–12 will be assigned to Dollarway High School, and Hardin Area sixth graders will be assigned to Dollarway Elementary School. Hardin Area students in grades 1–5 will be assigned to Pinecrest.

As drawn, the plan gives more or less limited assignment options to certain categories of students. The ultimate view which the Court takes of the case renders it unnecessary for the Court to describe those options or to pass upon their validity.

Some faculty desegregation has been achieved within the District and some additional progress is expected by the Board with respect to the 1969–70 school year. In that connection in its response to plaintiffs' objections to the Board's plan, the Board says:

"Responding to paragraph six, the plan provides for the achievement of substantially as much faculty desegregation as is possible without destroying the integrity of the faculty and thus that of the educational system. It is expected that at a minimum there will be at least two full time white teachers at Townsend Park Elementary School and two also at Townsend Park High School during 1969–70, five full time Negro teachers at Dollarway Elementary School and Dollarway High School, and one Negro teacher at Pinecrest Elementary School. As provided by the Resolution (adopting the plan), efforts to make additional assignments of teachers in schools where their race is in the minority will be vigorously pursued." [4]

As far as attendance zones are concerned, the Court finds from the evidence that the plan was adopted by the Board on the basis of studies made by Mr. Charles Fallis, who has been the District's superintendent of Schools for the past ten years and who has testified on a number of occasions in the course of this litigation. At the hearing on the plan which the Court held on March 11, 1969, Mr. Fallis testified on behalf of the District and was the only witness called by the Board.

When Mr. Fallis learned that the District was going to have to abandon freedom of choice, he began to devise the present plan. He had his five principals prepare "spot maps" showing the location of the residence of each of the students in the respective schools and identifying the grade levels of the respective students. Those maps did not identify any student by race. With the spot maps before him Mr. Fallis began to experiment with possible attendance zones and boundary lines with the end in view of assigning students in accordance with the neighborhood school concept to which reference has been made.

Mr. Fallis finally concluded that the zones finally established were the most rational and logical that could be devised in view of the geography of the district, the location of the schools, and the distribution of the District's population in relation to the schools. He expressed the opinion in his testimony that the zones established by him and adopted by the Board would most nearly conform to the neighborhood school concept to which he adheres, although he stated frankly that he would rather continue to operate under freedom of choice.

It appears from the testimony of Mr. Fallis that the Board accepted his recommendations without much, if any, discussion, except that the Board did reject

4. Evidence which the Court has heard from time to time in this case establishes that the Board views staff and faculty desegregation with a complete lack of enthusiasm. In the hearing which led up to the Court's decree of July 25, 1968, the Board undertook to establish by evidence that interracial assignments of teachers in districts like Dollarway is educationally unsound and is unworkable, and in connection with the appeal counsel for the Board argued that there is no constitutional mandate for the desegregation of faculties. That argument was rejected summarily by the Court of Appeals. 403 F.2d at 14–15.

the position taken by the Board's only Negro member that the District's schools should be restructured in line with the proposals now put forward by plaintiffs.

Although Mr. Fallis knew that he was devising a zoning plan for the purpose of disestablishing the existing dual school system he testified that he gave no consideration to race in determining zone boundary lines. He later conceded, however, that in his overall thinking on the subject he had considered race.

The Court does not consider that testimony necessarily to be inconsistent. To the extent that Mr. Fallis was able to put out of his mind what he obviously knows about his District and to consider the spot maps in a vacuum, he probably did not consider the race of the students whose residences were depicted on the maps. It seems obvious, however, that he must have known that all of the students covered by the maps submitted by the principals of the Townsend Park schools were Negroes and that the great majority of the students covered by the other maps were white.

If the racial nature of this case could be ignored, and if the District's schools could be viewed simply as "schools," and the inhabitants of the District simply as "people," the Court would have little, if any, trouble with the zones established by the plan.

As stated, the Dollarway complex is located about a mile west of the Townsend Park complex, and the Pinecrest School is located a few hundred yards west of the Dollarway campus. Thus, the schools are on an almost direct east-west axis. In view of the direction of that axis, and in view of the fact that the District proper is bisected roughly by the north-south running Highway and railroad tracks, it is obviously logical, apart from considerations of race, to assign students, particularly elementary students, so as to avoid insofar as possible the necessity of their crossing the Highway and the tracks in going to and returning from school.

With particular regard to the Pinecrest zone, Zone 5, it appears that that zone is quite small in comparison with the Dollarway Elementary and Townsend Park Elementary zones. However, if it is kept in mind that it is intended that all Hardin Area students in the first five grades are to be assigned to Pinecrest, and that the "logical" school for those students to attend is Pinecrest, the Court cannot say that Zone 5 was not laid out rationally.

But, the racial nature of the case cannot be ignored. It cannot be overlooked that the District's schools are not just "schools" and that the inhabitants of the District are not just "people." The schools of the District are still racially identifiable, and the people of the District consist of whites and Negroes who, in general, live in different parts of the District.

It is important for school officials in a district such as Dollarway not to confuse a means to a required end with the end itself. The end required by the controlling cases is the disestablishment of unconstitutional dual school systems and their replacement with unitary systems which are not unconstitutionally discriminatory.

If that end be accomplished, the federal courts are not properly concerned with the particular means to that end which the officials of a particular district may see fit to adopt. A particular means or method, whether freedom of choice, attendance zoning, or something else, is constitutionally permissible or impermissible to the extent that it is capable, on the one hand, or incapable, on the other hand, of achieving the ultimate objective which must be attained. Green v. County School Board, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716; Raney v. Board of Education (Gould, Arkansas), 391 U.S. 443, 88 S.Ct. 1697, 20 L.Ed.2d 727; Monroe v. Board of Commissioners, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733.

While the Court of Appeals evidently considered that the Board might well be

able to discharge its constitutional duty by a system of attendance zones, it is important to remember that the defendants in this case have not been mandated by either the Court of Appeals or this Court to establish a residential zoning plan, whether good or bad. The command to the Board is to eliminate the existing dual school system and to replace it with a unitary one.

As in the case of freedom of choice, a system of geographical attendance zones may be an effective means of integrating the schools of some districts and not an effective, or even feasible, means of integrating the schools of other districts. Cf. Green v. County School Board, supra, with Raney v. Board of Education, supra; see also Kelley v. Altheimer, Arkansas Public School Dist. No. 22, 8 Cir., 378 F.2d 483.

Under the present state of the law, as the Court views it, the question of whether a system of attendance zones will solve the integration problem of a particular district depends upon a number of factors including: the size and shape of the district; significant features of terrain; man-made geographical features such as streets, highways, and railroad tracks; the number of students to be served; the racial distribution of the district's population; the structure of the school system; the number of school plants operated by the district; and the location of individual schools both in relation to the students which they were designed to serve and in relation to each other; and the rationality of proposed zones.

Moreover, while purely educational considerations cannot be given priority over the constitutional rights of students to be educated in racially nondiscriminatory schools, Dove v. Parham, 8 Cir., 282 F.2d 256, 258–259, the Court does not think that a school board in choosing a method whereby an existing dual school system is to be disestablished is required to, or should, ignore educational considerations entirely. Nor should a Court ignore such considerations entirely in passing upon a plan submitted by a school district.

The situation existing in any particular district is seldom, if ever, an exact duplicate of that existing in another district. And in the last analysis the plan submitted by any district should be evaluated in the light of facts and circumstances which exist in that particular district.

When the Board's plan is considered in the light of the principles above stated and of the evidence in the case, the Court is not able to say that the plan in operation will disestablish the dual school system. Hence, the plan cannot be approved.

Figures supplied by the Board reflect the following information:

On the basis of residence, 1812 students will be entitled to instruction in the Dollarway Schools and in the Pinecrest School during the 1969–70 school year. Of those 1812 students, 335 are Negroes. Assuming that all of the 1812 students attend the schools of the District and that all of them are assigned to formerly all white schools, the percentage of Negroes will amount to only 18.4 percent of the total student body.

There are 1476 students who reside in the Townsend Park Zones. Only 86 of those students are white. If all of those 1476 children attend the District's schools during the 1969–70 session, and if all of them are assigned to the Townsend Park schools, the percentage of white students enrolled in those schools will be but 5.8 percent.

It is thus clear that although the numbers of Negro students and of white students are about equal, the formerly all white schools will remain predominantly white and that the Townsend Park complex will remain as a clearly identifiable Negro school system only tokenly desegregated. Further, the Court's assumption that all of the 86 white students in

the Townsend Park zones will attend the Townsend Park schools may well turn out to be unfounded. There is evidence of record which would justify a prediction at least that the parents of many white students residing in the Townsend Park zones will not send their children to those schools and will move out of the District if necessary to avoid doing so. Such an exodus, should it take place, would, of course, reduce the number of white students attending the formerly all Negro schools, and it is conceivable that no such students would attend school at the Townsend Park complex.

Returning for a moment to the matter of faculty desegregation, Paragraph 4 of the Resolution of the Board setting forth its plan states that the Board, if necessary, will make enough interracial assignments of faculty members to bring about a "racial composition of the faculty approximately corresponding to the racial composition of the students in each school," and "will insure the maintenance of such racial balance as a minimum during the period of transition to a fully desegregated faculty." While the plan suggests that there is a possibility that more than minimum interracial assignments of teachers will be made if such can be done on a voluntary basis, the Court thinks it unrealistic, in view of the District's history and the attitude of the Board about faculty desegregation, to believe that on a voluntary basis the minimum above mentioned will be exceeded in the near future.

As stated, under the Board's plan the formerly all white schools will remain predominantly white and the Townsend Park schools will remain predominantly, if not entirely, Negro. And it is seen from the preceding paragraph that faculty desegregation will be in proportion to student body desegregation. Thus, if the plan is permitted to go into effect the situation that will exist will be essentially the same as that which exists today.

The rejection of the Board's present plan leaves only two alternatives open to the Board: (1) A restructuring of the school system along the lines suggested by plaintiffs or along some other lines; (2) A random system of assignment of students and teachers to the schools without regard to race. The first of those alternatives is so obviously preferable to the second that the Court will not presume that the Board will give serious consideration to the latter.

At the hearing Mr. Fallis testified that it is not feasible for the Board to convert secondary schools into elementary schools and vice versa. What his testimony amounts to is that such conversions will be costly, and that the Board lacks money to carry them out. The Court knows that it is going to cost money to make substantial physical changes in the school plant and facilities; and the Court knows that the District is probably short of funds; most school districts in Arkansas are. But, the Court is not persuaded that the costs involved at Dollarway will be so great as to be prohibitive.

There are two answers to Mr. Fallis's objection.

First, the obligation of the Board to integrate its schools without further delay is paramount, and that obligation cannot be avoided or evaded by a plea of poverty.

Second, the Board is not required necessarily to adopt the plan put forward by plaintiffs or the converse of it, although the Court thinks that the Board may find that the plaintiffs' plan or a variant of it is the best method of solving the problem. That plan is similar to the one that has been put into effect at Gould and to that which this Court has recently ordered to be put into effect at Altheimer. It is for the Board to determine what procedure it will follow, and it makes no constitutional difference what route is followed so long as the required objective is achieved.

However, the Court thinks that as a minimum a unitary high school must be established. Without stopping to go into detail the Court thinks that for the next few years Dollarway High School

can be expected to graduate somewhat less than 100 students annually, and that Townsend Park High School can be expected to graduate somewhat more than 100 students annually. High schools graduating so few students a year are not operating at the optimum level of efficiency. When a school district of moderate population, like Dollarway, tries to operate two high schools, both schools tend to suffer from the standpoint of educational quality. Instruction and facilities are needlessly duplicated, and per pupil costs are unreasonably high. The Court thinks it self evident that but for a desire to operate racially segregated schools, the District would never have undertaken to operate two high schools; and in an integrated system there is no rational place for two high schools within the District.

Once the Board has established a unitary high school or a unitary secondary school system for the higher grades, it may deem it pointless to undertake to assign students in the lower grades on the basis of attendance zones. However, the Court is not prepared to say at this time that rational attendance zones for lower grade students cannot be established legally, although the Court has some doubt that the line of Highway 65 as extended would be any more permissible as a boundary between lower grade zones than it has turned out to be as a boundary for zones affecting all grade levels.

■ If the Board does restructure the schools adequately, the Court thinks that the problem of staff and faculty desegregation will probably be solved along with the problem of student body desegregation. The Court of Appeals apparently agrees. See Cato v. Parham, supra, 403 F.2d at 16, f.n. 9. The Board is already on notice that its duty to refrain from racial discrimination extends to staff and faculty as well as to students. And that duty includes the obligation not to discriminate on the basis of race if restructuring of the schools involves a reduction in school personnel. Smith v. Board of Education of Morrilton School Dist. No. 32, 8 Cir., 365 F.2d

770. The Board should not need to be told that after the schools are restructured, intra mural segregation or discrimination will not be tolerated.

A decree will be entered disapproving the Board's plan and directing the Board to proceed in a manner not inconsistent with this opinion to integrate its schools effective as of the opening of school in September of the current year. Not later than May 1 of this year the Board will report to the Court in writing the steps that it proposes to take in compliance with the decree.