William **BURLESON**, Father of Billy Wayne, Jimmy, and John Burleson et al., Plaintiffs,

v.

**COUNTY BOARD OF ELECTION COMMISSIONERS OF JEFFERSON COUNTY** et al., Defendants,

Frank M. Shue, Jr., et al., Intervenors.

No. PB–69–C–65.

United States District Court E. D. Arkansas, Pine Bluff Division.

Jan. 22, 1970.

Jack L. Lessenberry, Little Rock, Ark., for plaintiffs.

Robert V. Light, Little Rock, Ark., R. A. Eilbott, Jr., George Howard, Jr., Pine Bluff, Ark., for defendants.

Bert N. Darrow, Little Rock, Ark., for intervenors.

Memorandum Opinion

HENLEY, Chief Judge.

This cause, which has been tried to the Court, presents the question of whether white inhabitants of a geographically isolated portion of an Arkansas public school district faced with an obligation to integrate its schools may validly employ the Arkansas school and election laws so as to secede from the parent district and establish an autonomous district of their own. The case seems to be one of first impression.

While the suit is an independent action, it is an outgrowth of the protracted desegregation litigation involving the

schools of Dollarway School District No. 2, Jefferson County, Arkansas. Cato v. Parham, E.D.Ark., 297 F.Supp. 403.[1] The portion of the District involved is known as the Hardin Area. The Area is located some miles west of the District proper along U. S. Highway 270 which runs from Pine Bluff to Sheridan, Arkansas. The Area is separated from the District proper by a portion of the Whitehall School District of Jefferson County.

The population of the Area is almost exclusively white. In the fall of 1969 270 students residing in the Area were in attendance in the schools of the District, and only five of those students were Negroes.

In 1968 and 1969 this Court issued a number of decrees having for their purpose the elimination of the dual school system that the District had operated historically and the establishment of a unitary integrated public school system as required by ruling decisions of the Supreme Court of the United States. Specifically, the Court enjoined the use of the freedom of choice method of assigning students to schools and disapproved certain residential zoning plans submitted by the District's Board of Directors. Cato v. Parham, E.D.Ark., 293 F.Supp. 1375, aff'd 8 Cir., 403 F.2d 12; Cato v. Parham, E.D.Ark., 297 F. Supp. 403; Cato v. Parham, E.D.Ark., 302 F.Supp. 129, appeal pending.

As of the present time the student bodies of the junior and senior high grades of the District's schools have been essentially integrated, but integration of the elementary grades is less complete; and full staff and faculty desegregation has not been achieved.

A report filed with the Court by the Board on October 1, 1969, reflects that the District's total enrollment as of that time was 2,968 with about 55 percent of the students being Negroes. The report also reflects that 1,737 students were enrolled in the elementary grades or in special education classes at the elementary grade level.

According to the report, 772 white students were enrolled in the formerly all white elementary schools, and 194 Negroes were enrolled in those schools. The enrollment in the formerly all Negro elementary school was nine white students and 762 Negro students.

After the Court had entered its latest decrees in the Dollarway case in March and July, respectively, of last year residents of the Hardin Area formed a committee to circulate petitions throughout the District calling for an election on the question of whether the Area should be permitted to withdraw from the District proper and be constituted as an independent school district to be known as the Hardin District.

The efforts of the Committee were successful, and the Jefferson County Election Commission called an election to be held on September 11, 1969. On September 8 white parents and students residing in both the Area and the District proper commenced this action against the Election Commission seeking to enjoin the holding of the election. It was alleged in substance that the secession of the Area from the District would frustrate the decrees of this Court in the Dollarway case and would deprive the minor plaintiffs of their alleged right to attend racially integrated schools.

The Court declined to enjoin the holding of the election. The election was held, and the secession measure carried by a small majority. It would not have carried if a number of Negro voters re-

1. The Dollarway case was commenced in 1959 under the style Dove v. Parham, E.D.Ark., LR–3380. In 1967 the style of the case was changed to Cato v. Parham, and it was docketed in the Pine Bluff Division of the Eastern District of Arkansas. The litigation has produced a number of opinions by this Court and by the Court of Appeals for this Circuit.

siding in the District proper had not cast their votes in favor of secession.[2]

After the election was held, the complaint was amended so as to name as defendants the members of the Jefferson County Board of Education, the agency charged with the responsibility of implementing the election by setting up the new district and naming a temporary board of directors for it. Setting up the new district would involve a distribution of assets and liabilities of the original district and an allocation of revenues between the two districts.

Plaintiffs sought both a preliminary and a permanent injunction against the County Board of Education restraining it from performing the functions above mentioned. A hearing was held on plaintiff's motion for a preliminary injunction, and the motion was granted on September 23. When it became evident that the election would not be contested, an order was entered dismissing the complaint as against the election commission.

At the hearing on the motion for a preliminary injunction it became apparent to the Court that neither the proponents of the secession, nor the Dollarway Board, nor the Negro community in the District would be adequately represented by the County Board of Education which, not improperly, assumed a position of complete neutrality. Accordingly, the Court directed counsel for the plaintiffs to bring the District into the case and also to bring in known proponents of the secession and the Negro plaintiffs in Cato v. Parham as representatives of the Negro community.

Proponents of the secession did not wait to be joined as defendants; they filed an intervention in their own behalf. Plaintiffs did bring in the District and the plaintiffs in *Cato,* and the Court finds that all interested factions are now before it.

The position of the intervenors is that the proposed secession is not intended to, and will not, frustrate the Decrees of this Court, that it will not deprive plaintiffs of any federaly protected rights, and that it is perfectly legal and proper.[3] Both the District and the Negro representatives, like the County Board, have taken a neutral stand so that the real controversy here is between the plaintiffs and the intervenors.[4]

The case was tried on the merits on January 7 of the current year, and this memorandum incorporates the Court's findings of fact and conclusions of law. At the commencement of the trial it was agreed that the Court might consider certain facts appearing in the record in the Cato case and might also consider the evidence introduced at the hearing on the motion for a preliminary injunction.

The Court's jurisdiction is predicated upon 28 U.S.C.A. § 1343(3) and (4) and upon 42 U.S.C.A. § 1983. While all of the plaintiffs are white people, they, like Negroes, have a right to attend and to have their children attend a public school system that is free from racial discrimination as ordered by this Court, and in the Court's estimation they have standing to attack the proposed secession in this action and to secure injunctive relief if the secession would frus-

2. Whites outnumber Negroes slightly in the overall District as now constituted. Negroes outnumber whites in the District proper. If the Hardin Area leaves the District, the Negroes residing in the District proper could conceivably gain control of the School Board and consequently of the schools.

3. There is no question that the secession is appropriate as a matter of Arkansas school law.

4. A question could be raised as to whether the District is not obligated under the Court's decrees to resist its own dismemberment. That question has not been raised, and the Court's view of the case renders it unnecessary for the Court to raise the question on its own motion.

trate or seriously interfere with the implementation of the Court's decrees.

As stated, the Hardin Area is physically separated from the District proper. The District proper and all of its schools are located on the northern outskirts of the City of Pine Bluff. U. S. Highway 65 and certain railroad tracks run through the District proper from north to south. Residential housing in the District proper is segregated; most white residents live west of the highway and the tracks, and most of the Negro residents live east of the highway; some live between the highway and the tracks which are east of the highway.

The schools of the District now consist of Dollarway High School, Dollarway Junior High School, Dollarway Elementary School,[5] Pinecrest Elementary School, and Townsend Park Elementary School.[6] Hardin Area Students, including elementary grade students, who do not have private transportation are carried to and from school each day on busses owned by the District. The busses pick the children up around seven o'clock in the morning and return them to their homes between four and four-thirty o'clock in the afternoon.

Prior to April 1948 the Hardin Area was and had been for many years an independent school district. Its school plant consisted of two school buildings, one more modern than the other, and a teacherage. It offered instruction in its own schools to students in Grades 1–9;

high school students residing in the Area were sent to high schools in other districts on a tuition basis. As of that time the Dollarway District did not have a high school, and Dollarway students in Grades 9–12 attended school at the Pine Bluff High School, which was a school superior to high schools operated in neighboring districts.

In 1947 or 1948 the more modern of the school buildings owned by the Hardin District was destroyed by fire and was not rebuilt. At that time the District was probably under some pressure to merge into a larger district;[7] in any event, the Hardin Board of Directors decided to merge rather than to rebuild the destroyed school. Since Dollarway had an arrangement with Pine Bluff for the education of its high school students, the Hardin people decided to merge into the Dollarway District rather than into the adjacent Whitehall District or some other contiguous district.

The merger was effected without reservation in April 1948, and the Hardin Area has been in the Dollarway District ever since. From 1948 to about 1964 or 1965 the Dollarway District utilized the remaining school building in the Area as an elementary school. However, that building or its facilities came in need of substantial repairs or renovations which the District was unwilling or unable to make, and the school was closed.[8]

Since that action was taken, certain residents of the Area have been dissatis-

---

5. Those three schools are all on the same campus which is located on the west side of the highway.

6. What is now Townsend Park Elementary School was formerly two schools desiged for the education of Negro students at all grade levels. It is located east of the highway and the tracks and is near Arkansas A.M. & N. College, a predominantly Negro institution. For the sake of completeness it may be mentioned that Pinecrest Elementary School was designed originally as a white elementary school. It is located a few blocks west of the Dollarway School complex.

7. At the General Election of 1948 the people of Arkansas adopted Initiated Act No. 1 of that year, Ark.Stats., § 80–427 et seq., designed to eliminate school districts having fewer than 350 enumerates. Such districts were given a limited time to consolidate; affected districts that did not consolidate were abolished and merged into a county-wide district. See Haney v. County Board of Education of Sevier County, Ark., 8 Cir., 410 F.2d 920.

8. Until this case was tried, the Court had never had any very definite information about the history of the Hardin Area and had had limited information about the school facilities, past or present, in the Area.

fied with their connection with Dollarway, the dissatisfaction being principally directed at the bussing of the younger children to and from school. That complaint and others have had nothing to do with race or with school desegregation.

Substantially prior to the issuance of the Court's 1969 decrees there was sentiment in the Area favoring the reestablishment of the old Hardin District. In 1968 Area residents undertook to reestablish that District by petition to the County Board of Education; they were advised that they could not achieve their objective by that method, and that an election would have to be held.[9]

The Court finds from uncontradicted evidence that the secession of the Area would inflict severe damage upon the District financially. According to the testimony the District's loss of tax and other revenues based in large measure on the District's enumeration and pupils in average daily attendance might run as high as $100,000 per year. If the District has to bear that loss it is doubtful at best that it can provide any kind of quality education for its students, or that it can operate its schools for nine months terms, or that it can maintain its present accreditation. In addition, it will find it most difficult to employ and retain in employment competent personnel, particularly people who are willing to work and teach in an integrated school system.

The Court further finds that the secession, if permitted, will substantially increase the racial imbalance in the District's student bodies. As has been pointed out 270 students from the Hardin Area appear to have been in the District's schools last fall, and 265 of those were white. There is evidence to the effect that the Area's population is growing, and it may be assumed that next year there will be at least 265 white students residing in the Area who would

normally attend the District's schools. If those 265 white students are taken out of the District's total enrollment, the result will be, according to the Court's calculation, that 57 percent of the District's students will be black and only 43 percent white as opposed to the present 55–45 percent racial distribution.

Considering together the financial impact of the secession and the increased racial imbalance resulting therefrom, it is fairly inferable that there will be some exodus from the District's schools of white students now residing in the District, and it is possible that the entire system will become in effect an all black system with only a token number of white students in attendance.

Although the Court is not directly concerned in this action with what the Hardin residents can or will do about the education of their children if the secession is permitted, it seems clear from the evidence that they will have a great deal of difficulty financially if they try to operate a school system of their own. While a new Hardin District would have the remaining school building and the teacherage, the school building stands in need of substantial repair, including a new roof, a new ceiling and new wiring. There is no evidence as to how much those repairs would cost. There is evidence to the effect that the new district would not be able to borrow enough money to build a new building. In the division of assets between the parent district and the new one, Hardin could be allotted some of the portable classrooms owned by the District, but it is doubtful whether, as a matter of Arkansas law, the new district could take title to a permanent school building located outside its boundaries.

In point of fact the Court has not gained the impression that the Hardin residents plan to try to operate a twelve grade system. Their plan seems to be to

9. It is not clear that the 1968 plan to secede was formulated before the Court's decree rendered in March 1968. That decree outlawed freedom of choice at Dollarway and in so doing sounded the death knell for segregated schools in the District.

try to operate an elementary school and perhaps a junior high school and to send the students in the upper grades to some other district and pay tuition for them.

Much of the evidence at the trial was directed at the motive of the proponents of secession. Plaintiffs undertook to prove that the basic motivation was a desire to avoid an integrated school situation; the intervenors undertook to show that integration was not a factor in the equation.

While the Court is satisfied that a desire to escape the impact of the Court's decree was not the sole motive for the circulation of the election petitions and was not the sole factor taken into consideration by Hardin residents who voted for secession, the Court is also convinced and finds that the belief or hope of the Area residents that by seceding from Dollarway they could keep their children out of integrated schools or at least would be able to send them to districts having a smaller Negro population than Dollarway was a powerful selling point for the measure in the Area.

Having stated the facts in some detail, it now becomes necessary for the Court to define with precision the issue that is before it. Plaintiffs have pitched their case on the proposition that regardless of the motives of the proponents of secession that step, if taken, will frustrate the Court's decrees or will impede the District in carrying out its obligations. Plaintiffs have not raised and the Court does not reach the broad question of whether or in what circumstances an Arkansas school district can ever be divided or reconstructed geographically where such action would have a significant effect on the racial make-up of some or all of the schools located within the original district.

It may well be that there is no constitutional objection to a district that is not involved in desegregation litigation reconstructing itself in such a manner that one or more parts will not have a substantial Negro population and thus will have no integration problem.

But that is not the situation that exists at Dollarway. While the District has made progress toward establishing a unitary, integrated school system, it is far from its journey's end, and the Dollarway school case is still very much alive.

The Hardin Area was in the District when the litigation started, and it has remained there ever since. Its inclusion in the District has been assumed by the school officials in formulating their various desegregation plans and has been taken into consideration by the Court in evaluating those plans and formulating its decrees. Integration of the District including the Area and its students is one thing; integration of the District without the Area may be something else.

The Area residents do not want to move out of the District; they want to move the District and its problems away from themselves. The Court does not think that they can be permitted to avoid the supposed benefits or escape the supposed burdens of the Dollarway litigation so easily, or that in the existing circumstances a majority of the residents of the Area can deprive other residents of their present right to attend fully integrated schools at Dollarway.

No resident of the Area is required to remain there. No resident of the Area is required to send his children to the District's schools. But at this time the residents of the Area as a class cannot be permitted while remaining where they are to use the State's laws and procedures to take the Area out of the District.

That is not to say that the old Hardin District can never at any time or under any circumstances be reestablished. When the integration problem at Dollarway has been settled finally, when this litigation is at rest, if that day ever comes, it may turn out that there is no federal objection to the Area's withdrawing from the District and going its way in peace if, indeed, the residents still want to secede.

This Court, as a court of equity, has an inherent and continuing power to vacate or modify its injunctive decrees upon a proper and sufficient showing. See United States v. Swift & Co., 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999; Tobin v. Little Rock Packing Co., 8 Cir., 202 F.2d 234, affirming United States v. Little Rock Packing Co., E.D.Ark., 104 F.Supp. 527. And at a proper time residents of the Area will be free to try to make such a showing. All that the Court holds is that as of this time and in the existing circumstances the proposed secession cannot be permitted and will be enjoined.

A decree in accordance with the foregoing will be entered. All parties will bear their own costs.