Anthony T. LEE et al., Plaintiffs,

United States of America, Plaintiff-Intervenor-Appellants,

National Education Association, Inc., Plaintiff-Intervenor,

v.

MACON COUNTY BOARD OF EDUCATION et al.,

and

Calhoun County School System, Defendant-Appellee,

and

City of Oxford School System, Defendant-Appellee.

No. 30154.

United States Court of Appeals, Fifth Circuit.

June 29, 1971.

Rehearing and Rehearing En Banc Sept 20, 1971.

Coleman, Circuit Judge, concurred in part and dissented in part, and filed opinion.

See, also, 321 F.Supp. 1.

Wayman G. Sherrer, U. S. Atty., E. Ray Acton, Asst. U. S. Atty., Birmingham, Ala., Robert Pressman, Atty., Dept. of Justice, Civil Rights Div., Washington, D. C., Solomon S. Seay, Jr., Montgomery, Ala., T. W. Thagard, Jr., Montgomery, Ala., for appellant.

H. R. Burnham, John R. Phillips, Anniston, Ala., for appellee.

Before WISDOM, COLEMAN, and SIMPSON, Circuit Judges.

WISDOM, Circuit Judge:

■ This school desegregation case [1] involves the student assignment provisions of the plan for desegregating the public schools in Calhoun County, Alabama. The United States, plaintiff-intervenor, appeals from that portion of the court's order which would have the effect of leaving approximately 45 percent of this small district's Negro students in two virtually all-black schools; pairing alternatives would fully segregate both schools.[2] We feel compelled to reverse the district court on this issue.

## I.

Calhoun County, in northeastern Alabama, has a county school system serving rural areas and incorporated municipalities not having their own separate systems. There are five school systems in the county, the Calhoun County system and four city systems. In 1969–70, the county board operated 24 schools, of which two were all-black and ten all-white. The system had about 11,322 white and 1573 black students (12 percent). Over 1000 of the blacks were in the two all-black schools.[3] At issue here is the assignment of the students in these two schools, the Calhoun County Training School and the Thankful School. Necessarily involved in any desegregation plan are the formerly all-white schools in Oxford and Mechanicsville School, which is in a rural area. These schools lie closest to the all-black schools and present the most feasible opportunity for achieving desegregation by pairing.

Calhoun County Training School is located in all-black Hobson City, an incorporated town on the edge of Oxford City. Hobson City had a population of 770 in 1960; today it is thought to have double that population. County Training has served the black students not only of Hobson City but also of Oxford and other areas. Oxford Elementary School and Oxford High School, located on a common site, have served whites from Oxford and outlying areas. County Training and the Oxford schools are 1.6 miles apart by road.

Because of the school district's rural character and the board's previous maintenance of a segregated school system, the county has provided extensive school bus transportation for students. Of the almost 13,000 students in the county system 10,000 or 77.6 percent were bussed to school in 1969–70. Approximately the same percentage of students were bussed to the Oxford schools as in the system as a whole. Some of these students were picked up within the city boundaries.

1. A three-judge court consisting of Circuit Judge Richard T. Rives and District Judges Frank M. Johnson, Jr. and H. H. Grooms was convened in 1964 to hear a constitutional challenge to an Alabama tuition grant law. See Lee et als. v. Macon County Board of Education et als., M.D.Ala., 1964, 231 F.Supp. 743. Ninety-nine local school systems, including Calhoun County's were involved in the suit. See Lee v. Macon County Board of Education, 1967, 267 F.Supp. 458, aff'd sub nom. Wallace v. United States, 1967, 389 U.S. 215, 88 S.Ct. 415, 19 L.Ed.2d 422. The court continued to sit in the school desegregation cases. By its order of June 12, 1970, the three-judge court transferred this case to the Northern District of Alabama under 28 U.S.C. § 1404(a).

The matter giving rise to the June 12 order was not "required" to be heard by a three-judge court. The appeal therefore properly lies to this court. 28 U.S.C. §§ 1253, 1291.

2. Although the exact figures are not available to show the result of the district court's order, approximately 730 black students will be in the two all-black schools.

3. There were more Negroes in all-black schools last year than under the court's order for this coming year. This is because some of the black students at Calhoun County Training last year were assigned to other schools under the board's zoning plan.

Past de jure segregation and residential patterns have shaped the context of this case. In 1899 Hobson City, which had been part of Oxford, was separately incorporated after the area's black residents were gerrymandered out of Oxford, according to undisputed testimony in the record. Custom continued the residential segregation: Hobson City has remained all-black and in Oxford blacks (five percent of the population) live only in the section closest to the Oxford-Hobson border.

Oxford had an independent school system until 1932 when its schools became part of the county system. During this past school year, while the county system was under court order to submit plans for county-wide desegregation, Oxford established a city school system under a City Board of Education. This board requested the Calhoun County Board to transfer control of the two Oxford schools to the new board. The takeover became effective July 1, 1970. The city school board has urged that its status as an independent entity is relevant to desegregation proposals.

The other all-black school, Thankful School, is to the north of County Training. Thankful served 278 black children in grades 1–6 in the 1969–70 school year. Thankful is approximately one mile from Mechanicsville School, which has been serving 595 white children. During the 1969–70 school year, 510 of these were bussed to school. There are several other formerly all-white county elementary schools within a radius of about three miles of Thankful.

The issues in this case can best be considered by describing the plans submitted to the three-judge court by the various parties.

Under orders of the Court, the Calhoun County Board of Education, January 12, 1970, submitted a plan proposing the closing of the two black schools,[4] County Training and Thankful, and distributing the students from these schools among a number of the other county schools.[5] The Oxford schools would have received a number of the black students from County Training. The Oxford Board of Education, which asserts its separate identity with respect to sending its students to County Training, concurred in the plan. The school closing plan would result in an extended day-school schedule at Oxford High to house 1595 pupils in grades 7 to 12. While the plan indicated a capacity of 1840–1860 at Oxford High based upon the extended day scheduling, the Building Information Form for that school for the 1969–70 school year, stated that the maximum capacity was 1230. The plan would assign 1070 children to Oxford Elementary, with a regular capacity of 810, 1035 including 7 portable and 2 temporary rooms.

The plaintiffs and the United States objected to closing Calhoun County and Thankful on the ground that it was ra-

---

4. The county had previously closed several black schools and assigned the pupils to formerly white schools. This included the closing of grades 7–9 at Thankful.

5. The projection for the effect of the county's plan is as follows:

| School | Capacity | Gr. | Projected Enrollment W | N | T | Formerly W or N Schools |
|--------|----------|-----|---|---|---|---|
| Calhoun Co. Training | 1020 | | (Closed) | | | N |
| Thankful | 450 | | (Closed) | | | N |
| Blue Mountain | 180 | 1–6 | 151 | 29 | 180 | W |
| Eulation | 390–420 | 1–6 | 400 | 20 | 420 | W |
| Mechanicsville | 720 | 1–6 | 590 | 130 | 720 | W |
| Saks El. | 870–1010 | 1–6 | 950 | 62 | 1012 | W |
| Saks High | 1200 | 7–12 | 980 | 126 | 1106 | W |
| Oxford El. | 810–1035 | 1–6 | 820 | 250 | 1070 | W |
| Oxford High | 1840–1860 * | 7–12 | 1375 | 220 | 1595 | W |
| Welborn | 1380 | 7–12 | 1200 | 200 | 1400 | W |

* "On extended day school schedule"

cially motivated and would impose an unconstitutional burden on the Negroes. The conclusion that the proposed closing was racially motivated was based on the fact that the facilities to be closed were physically adequate and that the county board's justifications included the argument that whites would resist going to school in facilities formerly used by blacks. As an alternative, the plaintiffs and plaintiff-intervenors suggested various pairing plans that would link County Training with the Oxford Elementary and High Schools, and link Thankful School with Mechanicsville School.[6] On February 10, 1970, the court ordered the system to show cause why this alternative should not be implemented, noting that "[t]he school system's plan appears to impose an unnecessary burden on the children of both races solely to avoid assigning white students to a formerly black school. The imposition of such a burden, when based on racial factors, violates the Fourteenth Amendment."

According to the county superintendent of schools, the Thankful School, built in 1953, is "in good condition," has a "good" site and its "landscaping is fine". The Mechanicsville School, which would absorb more than 100 students if Thankful were closed, is located about one mile from Thankful. Its site is not as attractive as the one at Thankful. A portion of the Calhoun County Training School was built in 1945 and the remainder in the 1950's and 1960's. It might cost a million dollars to build a structure like Calhoun County Training at present. The system does not presently have available money for new construction. The court stated in the terminal order of June 12, 1970, that County Training had "an excellent physical plant. * * *"

The County System gave three reasons for opposing the pairing. (1) Whites would flee from the public schools.[7] (2) It would be expensive to

---

6. Several pairing proposals were put forward. For County Training and the Oxford schools, the plaintiffs at one point proposed, without attendance projections, the following division: Oxford Elementary 1–5; County Training 6–9, Oxford High 10–12. The plaintiffs later put forward the following pairing plan with projections:

| | Grades | White | Negro | Total | Capacity |
|---|---|---|---|---|---|
| Oxford Elementary | 1–4 | 575 | 175 | 750 | 810 |
| Oxford High | 5–9 | 860 | 249 | 1109 | 1230 |
| County Training | 10–12 | 694 | 233 | 927 | 1020 |

Additionally, the United States proposed the following pairing suggestion for these

| | | Enrollment | | |
|---|---|---|---|---|
| School | Gr. | W | N | T |
| County Training | 1–4 | 575 | 175 | 750 |
| Oxford El. | 5–8 | 625 | 175 | 800 |
| Oxford High | 9–12 | 1050 | 150 | 1200 |

There is some dispute as to the capacity of County Training. County records, before the issue of pairing was raised, showed it as 1020; countering the pairing proposals the county urged that in fact the capacity was only 750.

As to the pairing of Thankful and Mechanicsville, no grade structure was proposed by the parties. The following figures were presented:

| | Capacity | Wh. | N. | Total |
|---|---|---|---|---|
| Mechanicsville | 720 | | | |
| Thankful | 360 | 610 | 260 | 870 |

---

7. The board stated: "These Defendants believe, and, if given an opportunity to do so, will undertake to present oral testimony to show that if the Court adopts the proposed modification it will bring about extensive efforts to operate private school systems to accommodate any white students who might be assigned to the

convert the Training School to an elementary school. (3) Hobson City's two percent license tax, covering teachers, would make it difficult to acquire suitable teachers. The Oxford system opposed the pairing for a number of reasons. (1) It agreed with the county board that whites would flee the public schools.[8] (2) Hobson City is a separate town with its own government. (3) The Oxford System would not have elementary grades, thereby making it difficult to attract industry. (4) Pairing would require bussing; some students live 3 or 4 miles from County Training; the Oxford system did not intend to operate buses.

The county board then proposed a new plan that would keep both County Training and Thankful open for grades 1–6. Under this plan, student assignments would be based on geographic attendance zones. Since the zone boundaries followed historic neighborhood boundaries, their projected effect was to make County Training all-black and Thankful virtually so.[9] Children in grades 7 to 12 formerly attending these schools would be distributed to the formerly white schools according to the original county proposal.

After a hearing the district court entered a single order for the Calhoun County and Oxford systems accepting the county board's plan except for an amendment providing that the board operate County Training for grades 1 to 12 instead of 1 to 6. The order stated that "the evidence * * * reflects that [County Training] is an excellent physical plant". The effect of the order is to continue the school's all-black character serving grades 1 to 12 and to deprive approximately 200 black students of the integration provided by the county plan.[10] Under the plan, approximately 45 percent of the black students in the system will be assigned to Thankful and County Training, 29.4 percent to all-black County Training for their entire school careers.

facilities now housing Calhoun County Training School. It would further be likely to bring about extensive relocation of families in an effort to avoid such assignment. Adoption of the proposed alternative is certain to * * * create avoidable new problems".

8. The defendants strongly urge to the court that the closing of the Oxford Elementary School would not effect a racial balance and would do more toward resegregating the races according to color than ever before; that the parents of children living in Oxford would not send their young children unescorted into an all colored municipality; that private schools have been established and are being established in Oxford and Anniston and their enrollments for the next school year have already reached their capacity.

9. The figures for the county board's revised plan are as follows:

|  | Gr. | Enrollment | | Capacity |
|  |  | W | N |  |
| Thankful | 1–6 | 20 | 230 | 360 |
| Mechanicsville | 1–6 | 590 | 30 | 360 |
| Blue Mountain | 1–6 | 175 | 5 | 180 |
| Saks El. | 1–6 | 950 | 5 | 1012 |
| Eulation | 1–6 | 390 | 6 | 420 |
| Oxford El. | 1–7 | 960 | 95 | 1070 |
| County Training | 1–6 | — | 250 | 750 |

Children 7–12 grades in the Thankful zone would attend Saks and Wellborn High schools, and those in the County Training zone would attend Oxford High.

10. Figures are not available on the exact number of students that County Training would have under the plan. The Oxford board has submitted information showing that under the plan it would have only 157 Negro students out of an enrollment of 2441 in grade 1–12.

## II.

The first issue we discuss is whether Oxford's secession from the Calhoun County school system requires that its schools be treated as an independent system. Oxford asserts its freedom to keep its pupils in schools within the city limits; the board had no objection to receiving black students in its schools from outside the city, as was proposed by the county in its original plan. But the city's claim to be treated as a separate system has little merit. In its power as a court of equity overseeing within this Circuit the implementation of Brown v. Board of Education, 1955, 349 U.S. 294, 300, 75 S.Ct. 753, 756, 99 L.Ed. 1083, this Court must overcome "a variety of obstacles in making the transition to school systems operated in accordance with the constitutional principles set forth in (Brown I)." *Brown II, supra.*

■ For purposes of relief, the district court treated the Calhoun County and Oxford City systems as one. We hold that the district court's approach was fully within its judicial discretion and was the proper way to handle the problem raised by Oxford's reinstitution of a separate city school system. The City's action removing its schools from the county system took place while the city schools, through the county board, were under court order to establish a unitary school system. The city cannot secede from the county where the effect—to say nothing of the purpose—of the secession has a substantial adverse effect on desegregation of the county school district. If this were legally permissible, there could be incorporated towns for every white neighborhood in every city. See Burleson v. County Board of Election Commissioners of Jefferson County, E.D.Ark.1970, 308 F.Supp. 352 (proposed re-establishment of a discontinued district); Wright v. County School Board of Greensville County, Va., E.D.Va.1970, 309 F.Supp. 671; United States v. Halifax County Board of Education, E.D.N.C., 314 F.

Supp. 65, May 23, 1970; Turner v. Warren County Board of Education, E.D. N.C., 313 F.Supp. 380, May 23, 1970. Even historically separate school districts, where shown to be created as part of a state-wide dual school system or to have cooperated together in the maintenance of such a system, have been treated as one for purposes of desegregation. See Haney v. County Board of Education of Sevier County, 8 Cir. 1970, 410 F.2d 920; United States v. Crockett County Board of Education, W.D.Tenn. May 15, 1967, C.A. 1663.

■ School district lines within a state are matters of political convenience. It is unnecessary to decide whether long-established and racially untainted boundaries may be disregarded in dismantling school segregation. *New* boundaries cannot be drawn where they would result in less desegregation when formerly the lack of a boundary was instrumental in promoting segregation. *Cf.* Henry v. Clarksdale Municipal Separate School District, 5 Cir. 1969, 409 F.2d 682, 683, 688, n. 10.

Oxford in the past sent its black students to County Training. It cannot by drawing new boundaries dissociate itself from that school or the county system. The Oxford schools, under the court-adopted plan, supported by the city, would serve an area beyond the city limit of Oxford. Thus, the schools of Oxford would continue to be an integral part of the county school system. The students and schools of Oxford, therefore, must be considered for the purpose of this case as a part of the Calhoun County school system.

## III.

■■ The second question is whether the plan approved by the district court is sufficient to satisfy the school board's affirmative duty to disestablish the dual system. A geographical zoning plan for student assignments will sometimes satisfy this duty, depending on its practical effects and the feasible alternatives. But it will not satisfy the

board's duty to dismantle the dual system when it does not work. Henry v. Clarksdale Municipal Separate School District. To be satisfactory, a zoning plan must effectively achieve desegregation. When historic residential segregation creates housing patterns that militate against desegregation based on zoning, alternative methods must be explored, including pairing of schools. *See* Green v. County School Board, 1968, 391 U.S. 430, 442, n. 6, 88 S.Ct. 1689, 20 L. Ed.2d 716. Swann v. Charlotte-Mecklenburg Board of Education, 1971, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554.

██ An analysis of the plan adopted by the district court shows that it does not satisfy the board's obligation to desegregate. While the plan does put some black students in formerly all white schools, it leaves over 45 percent of the district's Negro students in all-black or virtually all-black schools. This continued segregation results from extensive residential segregation and boundary drawing to retain "the comfortable security of the old, established discriminatory pattern." Monroe v. Board of Commissioners of City of Jackson, 1968, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733. For instance, the zone boundaries adopt the dividing line between Oxford and Hobson, a boundary tainted by racial gerrymandering.

The appellees contend with respect to County Training that Hobson takes pride in its school and wants it to continue as it has been. Although this seems a misinterpretation of the testimony of Mayor Striplin of Hobson,[11] even if it were accurate it would not support a defective plan. The district court should require the School Board forthwith to constitute and implement a student assignment plan that complies with the principles established in Swann v. Charlotte-Mecklenburg Board of Education.

## IV.

██ ██ The county board's original plan proposed to close the formerly black schools and disperse the students among formerly white schools. Although this plan would bring about student body desegregation, plaintiffs objected that the plan was unconstitutional because the closing of the two schools was racially motivated and placed an unequal burden on Negro students.

Closing schools for racial reasons would be unconstitutional. The equal protection clause of the fourteenth amendment prevents any invidious discrimination on the basis of race. Yick Wo v. Hopkins, 1886, 118 U.S. 356, 6 S. Ct. 1064, 30 L.Ed. 220. A governmental unit bears a "very heavy burden of justification" to support any use of racial distinctions. Loving v. Commonwealth of Virginia, 1967, 388 U.S. 1, 9, 87 S.Ct. 1817, 18 L.Ed.2d 1010. Under general equal protection doctrine, therefore, it would be impermissible for the school board to close formerly black schools for racial reasons. More particularly, such action is prohibited by the school desegregation cases. *Brown II, supra,* calling for "a racially nondiscriminatory school system," and its progeny require not only that past discriminatory practices be overcome by affirmative actions but also that new forms of discrimination not be set up in their place. Closing formerly black school facilities for racial reasons

11. Mayor Striplin seemed from the record to be saying only that if the schools were not to be paired the black community would prefer to have the facility used by 12 grades than have it partially abandoned. But there was other language that would support an interpretation that the community desired to have a twelve grade all-black school. In a letter dated January 7, 1970, addressed to the Director of the Health, Education, and Welfare Department, Mayor Striplin wrote, in part:

"it would bring hardship to this 1,500 populated community to be without a school. We are not trying to buck the guide lines, we are only asking you to spare our school in some way. ¶ We have Whites living all around us. Some in walking distance, some on the bus lines, can they be brought in? They are welcome. * * *"

would be such a prohibited form of discrimination. "Such a plan places the burden of desegregation upon one racial group." [12] Brice v. Landis, N.D.Cal. 1969, 314 F.Supp. 974. See Quarles v. Oxford Municipal Separate School District, N.D.Miss. January 7, 1970, C.A. W.C. 6962–K.

We are frankly told in the County Board's brief that without this action it is apprehended that white students will flee the school system altogether. "But it should go without saying that the vitality of these constitutional principles cannot be allowed to yield simply because of disagreement with them." *Brown II*, 349 U.S. at 300, 75 S.Ct. at 756. See Monroe v. Board of Commissioners of Jackson, 391 U.S. at 459, 88 S.Ct. at 1700.

In Gordon v. Jefferson Davis Parish School Board, 5 Cir. 1971, 446 F.2d 266 [No. 30,075], this Court, relying on Quarles, Brice, and Haney v. County Board of Education of Sevier County, 8 Cir. 1970, 429 F.2d 364, recently remanded the case to the district court with directions that the court "promptly conduct hearings, and thereon make findings and conclusions as to whether or not the closing [of two schools] was in fact racially motivated." Here, however, it is clear from the record and briefs that the primary reason for closing the schools was the county board's conclusion that the use of the black facilities would lead whites to withdraw from the public system. And there is little evidence of any legitimate reasons for the closings. Although arguing below that the black facilities were inferior, appellees asserted on appeal that the

facilities of County Training "are excellent." Also, the district court found County Training to have an "excellent physical plant" in assigning twelve grades of black students there. Thus the action is not supported by the inferiority of the physical facilities. Moreover, the county's plan would have required an extended day at Oxford High because of the crowding caused by closing County Training. On the record before us, the county's original proposal is unacceptable.

## V.

In contrast to the defects of the plan adopted by the court and the county's original plan to close County Training and Thankful Schools, the school system seems suitable for pairing several schools to achieve desegregation. County Training and the Oxford Elementary and High School complex are only 1.6 miles apart by road. Thankful and Mechanicsville are only one mile apart. These figures compare favorably with distances between elementary schools this court has ordered paired in the past. *See, e. g.,* Bradley v. Board of Public Instruction of Pinellas County, 5 Cir. July 28, 1970, 431 F.2d 1377 (elementary schools one and two miles apart paired).

In addition, a great number of the students attending these schools in the past have been transported to school by the county school bus system. In its original proposal the county planned to provide the necessary transportation for the black students to be dispersed to the formerly white schools, demonstrating the ability of the county to use its transportation system to accomplish desegre-

---

12. In Brice v. Landis, N.D.Cal., August 8, 1969, No. 51805, the court discussed the discriminatory closing of formerly black schools:

"The minority children are placed in the position of what may be described as second-class pupils. White pupils, realizing that they are permitted to attend their own neighborhood schools as usual, may come to regard themselves as 'natives' and to resent the negro children bussed into the white schools every school day as intruding 'foreigners.' It is in this respect that such a plan, when not reasonably required under the circumstances, becomes substantially discriminating in itself. This undesirable result will not be nearly so likely if the white children themselves realize that some of their number are also required to play the same role at negro neighborhood schools."

gation. The bussing necessary to handle the pairing might involve a moderate increase over that provided by the County in the past. Where transportation facilities exist, a requirement of a moderate increase in transportation is a proper tool in the elimination of the dual system. Tillman, Jr. v. Board of Public Instruction of Volusia County, 5 Cir. July 21, 1970, 430 F.2d 309.

The appellees overstate the case as to the alleged difficulties in pairing. The first assertion is that physical barriers exist between County Training and the Oxford School complex, i. e. railroad tracks and highways. But a view of the maps of Oxford and Hobson show that these barriers not only separate the two schools but also separate a large number of white students from the Oxford school complex. The result is that some white students live on the County Training side of the tracks and highways, and therefore crossed these to attend the Oxford schools. Barriers that in the past have yielded to segregation should not now prevent pairing to achieve integration. Also, the difficulty of physical barriers is decreased by the availability of transportation.

The appellees also assert that the road that school busses must use in traveling to County Training is unsafe for such buses. Considering that this road has been used by school buses going to County Training in the past in order to maintain segregation, such difficulties cannot now be found insurmountable.

The City of Oxford argues that pairing cannot proceed on the assumption that pupils will be transported. In the past it has been the practice of the county school system not to transport children living within a separate municipal school district to schools run by the municipality. But application of the rule to the situation involved here is predicated on the idea that Oxford has become a separate school district. Since we have concluded that for purposes of this case the Oxford schools should not be considered a separate entity, the county must continue to treat Oxford as an integral part of the county system for purposes of providing school bus transportation. Last school year the county did provide transportation to Oxford Elementary and High Schools for some students living within the Oxford city limits. The county board must now reconstitute its transportation system to provide transportation necessary for the pairing ordered by this decision. Singleton v. Jackson Municipal Separate School District, 5 Cir. 1969, 419 F.2d 1211, 1217, n. 1 (en banc), rev'd other grounds, sub nom. Carter v. West Feliciana Parish School Board, 1970, 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 477.

The appellees also argue that none of the pairing proposals suggested by the plaintiffs are practicable because the capacity of County Training is too small to accommodate the number of pupils that would be assigned to it under them. We note that until the question of pairing arose the official records of the county system showed County Training's capacity to be 1020, as opposed to the 750 now said to be its capacity. Even if the capacity is 750, pairing is feasible. See the proposal by the United States, note 6 *supra*.

We do not prescribe the grade structure to be used in pairing these two sets of schools. The county system (including the Oxford City board), after consulting with the plaintiffs and the plaintiff-intervenors, should assign grades to these schools for the 1970–71 school year, using each school to the same fraction of its capacity as far as practical.

The judgment of the district court as it relates to student assignment is vacated and the cause is remanded with directions that the district court require the School Board forthwith to institute and implement a student assignment plan that complies with the principles established in Swann v. Charlotte-Mecklenburg Board of Education and reflects any changes in conditions relating to

school desegregation in Calhoun County since the Court's decree of June 12, 1970.

The district court shall require the School Board to file semi-annual reports during the school year similar to those required in United States v. Hinds County School Board, 5 Cir. 1970, 433 F.2d 611, 618–619.[13]

Vacated and remanded with directions.

COLEMAN, Circuit Judge (concurring in part and dissenting in part).

I regret that I cannot fully agree with the majority opinion in this case. Of course, I agree that all reasonable means must be exercised to dismantle dual school systems and to establish unitary ones. My disagreements, now and in the past, have been founded upon my opposition to unrealistic plans, doomed to failure from the beginning, whereas a discretionary approach by the District Judge would more likely have been crowned with better results, rather than destroying public schools, so badly needed by white and black alike.

Admittedly the problem in Calhoun County, Alabama, is not acute. There appears to be no real obstacle to the speedy accomplishment of a unitary school system in this area.

I agree that school systems *in the process of desegregation* may not escape their obligations by changing their operational status, as Oxford has attempted to do.

From such knowledge of history as I have I am not convinced, that the incorporation of Hobson City in 1899, when

Plessy v. Ferguson [163 U.S. 537, 16 S. Ct. 1138, 41 L.Ed. 256] was on the books, had any racial connotations, unless it may have been that the black citizens desired a municipality of their own, as, for instance, Mound Bayou, Mississippi.

For the reasons stated in my dissenting opinion in Gordon v. Jefferson Davis Parish School Board [No. 30,075], 446 F.2d 266, I disagree with Part IV of the majority opinion. As I said there, race is, of necessity, at the bottom of all school desegregation orders; otherwise there would be no Fourteenth Amendment jurisdiction. I shall not repeat here that which I have already put of record in *Gordon*. I simply adhere to the point.

I shall only add a reference to what the Supreme Court said in North Carolina State Board of Education v. Swann:

"Just as the race of students must be considered in determining whether a constitutional violation has occurred, so also must race be considered in formulating a remedy." 402 U.S. at 46, 91 S.Ct. at 1286.

## ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

PER CURIAM:

The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is denied.

---

13. This decision is based on a state record, in part because this Court (en banc) determined to withhold all decisions in school desegregation cases pending the Supreme Court's issuance of its judgment in Swann v. Charlotte-Mecklenburg.